NATIONAL AUDUBON SOCIETY, Bering Sea Fishermens' Association, Trustees for Alaska, the Wilderness Society, Defenders of Wildlife, National Wildlife Refuge Association, Friends of the Earth, Natural Resources Defense Council, Inc., Plaintiffs,

v.

Donald P. HODEL, William P. Horn, Robert Jantzen, Keith Schreiner, Cook Inlet Region, Inc., Calista Corporation, Sea Lion Corporation, Malcolm Baldridge, John V. Byrne, Defendants.

NATIONAL AUDUBON SOCIETY, Trustees for Alaska, the Wilderness Society Defenders of Wildlife, National Wildlife Refuge Association, Friends of the Earth, Natural Resources Defense Council, Inc., Plaintiffs,

v.

COOK INLET REGION, INC., Calista Corporation, Sea Lion Corporation, Defendants.

NATIONAL AUDUBON SOCIETY, Trustees for Alaska, the Wilderness Society Defenders of Wildlife, National Wildlife Refuge Association, Friends of the Earth, Natural Resources Defense Council, Inc., Plaintiffs,

v.

Robert PUTZ, Regional Director, United States Fish and Wildlife Service, Cook Inlet Region, Inc., Calista Corporation, Sea Lion Corporation, Defendants.

Nos. A83–425 Civ., A84–401 Civ. and A84–402 Civ.

United States District Court, D. Alaska.

Nov. 30, 1984.

Eric Smith, Trustees for Alaska, Anchorage, Alaska, Kenneth Berlin, James P. Leape, Washington, D.C., for plaintiffs.

Bruce Landon, Asst. U.S. Atty., Stephen C. Hillard, Cook Inlet Region, Inc., William H. Bittner, Calista Corp., Sea Lion Corp., Anchorage, Alaska, for defendants.

OPINION

FITZGERALD, Chief Judge.

On August 10, 1983, Deputy Under Secretary of the Interior, William P. Horn, acting on behalf of then Secretary of the Interior James G. Watt (the Secretary), entered into a land exchange agreement with representatives of three Alaska Native corporations. The three corporations, Cook Inlet Region, Inc., Calista Corp., and Sea Lion Corp., are referred to collectively as CIRI. The Secretary transferred to the Native Groups part of St. Matthew Island, a wilderness area within the Alaska Maritime National Wildlife Refuge, in exchange for various land interests in the Kenai and Yukon Delta National Wildlife Refuges. The driving force behind the land exchange was to enable CIRI to lease the St. Matthew Island parcel to private entities for construction and operation of support facilities for oil exploration and potential oil development in the Navarin Basin of the Bering Sea. In making the exchange, the Secretary relied upon the authorization granted in § 1302(h) of the Alaska National Interest Lands Conservation Act.[1] The conveyance is for fifty years, or so long as commercial oil production activities occur in the Navarin Basin.

Provisions were included in the land exchange agreement for an interim period of cooperative management between CIRI and the Secretary. The agreement included additional conditions obligating CIRI to comply with federal law, and, in certain instances, to obtain necessary permits from government agencies prior to land development. In addition, the agreement imposed restrictions on land use, and included stipulations to mitigate environmental impacts as well as to ensure restoration upon eventual reversion of the land to the federal government.

On the day the exchange agreement was signed, the National Audubon Society and other environmental groups,[2] joined by the Bering Sea Fishermen's Association, filed a complaint in this court in case A83–425 (the exchange case) for declaratory and injunctive relief. The named defendants in the suit include the Secretary of the Interior and Native groups. The relief sought by the plaintiffs (collectively referred to as Audubon) is a judicial declaration that the exchange agreement is unlawful and void, and a permanent injunction preventing the defendants from carrying out any part of the agreement, thereby prohibiting the defendants from conducting any activity on St. Matthew Island. In September 1984, two other related suits were filed also seeking declaratory and injunctive relief in this court. These cases will be considered in turn.

Motions have been filed in case A83–425 for summary judgment. I now conclude on the face of the administrative record that the Secretary, in entering into the land exchange, abused the discretion entrusted to him by law.

BACKGROUND

*The Statutes*

Several provisions of the Alaska National Interest Lands Conservation Act (ANILCA) and the Alaska Native Claims Settlement Act (ANCSA) are drawn into the issues of this litigation. Congress enacted ANILCA[3] in 1980. The Act set aside approximately 105 million acres of federal land in

---

**1.** 16 U.S.C. § 3192(h) (1982).

**2.** Trustees for Alaska, The Wilderness Society, Defenders of Wildlife, National Wildlife Refuge Association, and Friends of the Earth.

**3.** 16 U.S.C. §§ 3101–3233 (1982).

Alaska for protection of natural resource values by permanent federal ownership and management.[4] The Alaska Maritime National Wildlife Refuge (NWR), within which St. Matthew Island lies, was included as lands designated for environmental protection under ANILCA.[5]

Congress enacted ANCSA[6] in 1971 to effectuate a comprehensive settlement of all Native claims based on subsistence use and occupancy of land in Alaska. Several provisions of ANCSA were incorporated into the statutory framework of ANILCA.[7]

*St. Matthew Island*

St. Matthew Island was established as a wildlife refuge in 1909. It was designated a wilderness area in the National Wilderness Preservation System on October 23, 1970. Through this designation, Congress declared its intention that St. Matthew Island remain in its pristine and natural form.[8] Many factors contribute to the island's value as a wilderness area, including its isolation, remoteness, distance from shipping lanes and aircraft routes, rugged and varied terrain, and unique bird and mammal populations. Aside from minor evidence of past human presence on the island, St. Matthew remains essentially natural in appearance.

*Planned Oil Exploration and Development Activities*

The draft environmental impact statement (DEIS) prepared in connection with plans for federal oil and gas leases in the Navarin Basin outlines three scenarios for transportation of oil and gas from the lease area: (1) pipeline to St. Matthew Island, the primary scenario, (2) pipeline to St. Paul Island, the alternative scenario, and (3) offshore loading. The offshore loading scenario includes locating marine and air support facilities on St. Matthew Island. Of the three scenarios, two require development activities on the island.

Under the primary scenario, St. Matthew Island would play a role during both Phase I, the exploration phase, and Phase II, the development and production phase. During Phase I, primary marine and air logistics support would operate out of existing facilities in Dutch Harbor/Unalaska and Cold Bay. St. Matthew Island would serve as a forward base for limited air support.

During Phase II, both marine and air support facilities would be located on St. Matthew Island. Crude oil would be piped to a major storage, loading, and processing terminal on the island, and then transferred to shuttle tankers for shipment to a remote storage and transshipment terminal on the Alaska peninsula. Gas resources, if developed, would be piped to facilities on the island, liquefied and transported direct to market by tankers.

THE SECRETARY'S DECISION APPROVING THE LAND EXCHANGE

The exchange provision in § 1302(h) of ANILCA imposes two requirements before a land exchange may be approved. First, the Secretary must determine that the exchange will result in "acquiring lands for the purposes of [ANILCA]." Second, the exchange must further the "public interest" if the lands exchanged are of unequal value.[9]

There are two principal documents in the record which explain the considerations and the rationale upon which the Secretary rested his decision to proceed with the land exchange. These include the Department of the Interior Record of Decision and the Public Interest Determination for the Proposed Acquisition of Inholdings in Kenai and Yukon Delta National Wildlife Refuges by Exchange for Lands on St. Matthew Island, Alaska.

---

**4.** S.Rep. No. 413, 96th Cong., 2d Sess. 126, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5070, 5071.

**5.** ANILCA § 303(1)(ii), 16 U.S.C. § 668dd note (1982).

**6.** 43 U.S.C. §§ 1601–1628 (1982).

**7.** *See* ANILCA § 1412, 43 U.S.C. § 1639 (1982).

**8.** 16 U.S.C. § 1431(a) (1982).

**9.** *Id.* § 3192(h) (1982).

These documents disclose that the Secretary concluded that the land exchange met both requirements of § 1302(h). In connection with the first requirement, the Secretary has concluded that ANILCA's purposes would be furthered in several important respects: (1) the interests obtained in the Kenai and Yukon Delta NWRs would "be consistent with and further the purposes of the refuges to which they are added"; (2) these acquisitions would "consolidate significant recreational lands and wildlife habitat lying within units of the [NWR] System and National Wilderness Preservation System into permanent federal ownership"; (3) wildlife management benefits would result from this consolidation of conservation system units (CSUs); (4) protection of prime waterfowl habitat would be increased; (5) Native selection conveyance expenses would be reduced; and (6) the possibility of inconsistent land use by Natives within CSUs would be reduced.

Concerning the second requirement, the Secretary has concluded that the exchange would also further the public interest. The Secretary offered seven major reasons for his conclusion:

(1) The exchange advances longterm CSU and general wildlife conservation and management objectives by preventing the creation of over 100 Native inholdings within CSUs without permanent loss of CSU acreage; providing federal management and public enjoyment benefits which comport with congressional intent that CSU inholdings be eliminated primarily through land exchanges; and improving the protection provided by § 22(g) of ANCSA [10] through a nondevelopment easement and permanent federal management of CSU lands.

(2) The exchange as a whole also advances the public interest in CSU objectives during the short term because the United States will secure land interests in over three times the CSU acreage it will be conveying; will obtain clear title to and interest in more biologically and recreationally significant lands in terms of wildlife habitat quality than would be temporarily conveyed out of federal ownership; and will secure greater environmental protection by reason of the nondevelopment easement acquired in the important waterfowl nesting habitats at Kokechik Bay, outweighing the temporary wildlife disruption authorized on St. Matthew Island.

(3) The exchange is in the public interest in terms of advancing the objectives of public enjoyment of CSUs because the United States will acquire acreage in the Kenai National Wildlife Refuge which is heavily used by the public, while only temporarily disposing of land on St. Matthew Island lacking in recreational potential.

(4) The protection of wildlife refuge values afforded by the exchange's land use stipulations and applicable laws and regulations also helps assure that the public interest in maintaining essential wildlife and coastal zone values is preserved in the exchange. The stipulations permit the Fish and Wildlife Service to review operations plans and to seek judicial review if the agency concludes development would damage wildlife resources.

(5) The interim management constraints provide immediate CSU management for all interests transferred or relinquished by CIRI, even if CIRI later exercises its option to rescind the exchange.

(6) Additionally, CIRI's intended use of the strategically located St. Matthew Island realty for a staging area for Navarin Basin energy development offers substantial environmental, human safety and economic benefits because the island's close location to the Navarin Basin provides critical time advantages in responding to environmental dangers and human safety emergencies when compared to other potential staging areas, and the increased economic efficiency in offshore energy exploration and development allowed by St. Matthew Island's use may result in higher bidding revenues received on the lease sale and additional domestic oil and gas production.

---

**10.** 43 U.S.C. § 1621(g) (1982).

(7) Finally, the exchange also will be favorable from other relevant public interest perspectives outside the conservation area, including the promotion of an expeditious settlement of Alaska Native land claims and the elimination of costs associated with conveyancing and management of unconsolidated federal parcels.

CONTENTIONS OF THE PARTIES

In addition to the challenge to the validity of the land exchange agreement, two other related cases are involved in this litigation. On September 18, 1984, Audubon and other environmental groups filed a complaint in this court in case A84–402 (the NEPA case) against Robert Putz, Regional Director of the United States Fish and Wildlife Service (FWS) in Alaska, and CIRI. The immediate cause leading to the filing of this case was the Regional Director's nonopposition to CIRI's operational plan for St. Matthew Island.

CIRI's operating plan for St. Matthew Island facility construction was submitted to Putz on August 20, 1984. Putz responded by letter on August 30, 1984, noting that the plan of operations submitted addressed only the construction phase of the project. He stated that it was his conclusion that construction activity carried out in accordance with the plan would not result in significant damage to St. Matthew Island bird or other wildlife populations. Prior to utilization of the facilities, however, CIRI would be required to consult with and obtain comments from the Regional Director on an additional plan describing use of the facilities as well as reasonable alternative methods of operation. Putz noted that he had no objection to the construction phase of the project.

Audubon sought by this lawsuit to enjoin the defendants from undertaking any actions on St. Matthew Island until an environmental impact statement (EIS) could be prepared on CIRI's proposed plan of operations. Audubon claimed that the letter of nonopposition sent by Putz constituted major federal action triggering EIS requirements.

The federal defendants' opposition to Audubon's claim for injunctive relief contended that the exchange agreement did not provide for nor require "approval" by the Regional Director before CIRI could begin construction or operation activities on St. Matthew. "In fact, the CIRI Group may undertake any activities upon the island subsequent to providing the Regional Director with notice of its planned activities thereon and abiding by the time frame for review".

According to the federal defendants, review of paragraph 10(b) of the exchange agreement required CIRI only to notify and consult with the Regional Director of FWS concerning planned operations on the island. Moreover, CIRI was entitled to proceed with its construction plan whether the Regional Director objected or not. The Regional Director's only recourse, should his recommendations be disregarded, was to obtain judicial review of whether CIRI's planned operations violated the standards contained in paragraph 10(b) of the exchange agreement. In other words, since the exchange created a private inholding on St. Matthew Island, CIRI was free to use the land without restriction so long as construction and operations plans were submitted to the Regional Director for comment and recommendations.

The federal defendants also suggest that even though conveyance of the St. Matthew lands is subject to a restriction in the patent under ANCSA § 22(g), the requirements of § 22(g) were satisfied by the stipulations included in the exchange agreement. Indeed, at the hearing on Audubon's motion for a preliminary injunction, government's counsel stated that the Secretary's responsibilities under this provision of ANCSA are very limited. Section 22(g) does not "talk to any specific activity. It basically says that [the conveyed lands are] subject to the laws and regulations of the national wildlife refuge." [11] The Secretary

---

11. Oral argument by Ronald G. Gluck at Hearing on Plaintiffs' Motion for Preliminary Injunction (October 22, 1984).

fully complies with § 22(g), the argument goes, by the proper placement of the statutory language in the government's land patents. He has no affirmative duty to prevent proposed incompatible activities within the exchange lands.[12]

In case A84–401 (the permit case), the companion case to A84–402 filed on September 18, 1984, declaratory and injunctive relief was sought by the same plaintiffs against CIRI. According to the documentation submitted in that case, CIRI had applied to the United States Army Corps of Engineers (the Corps) for a permit to place fill material on wetlands on St. Matthew Island and to construct an airstrip and to place gravel for road construction. In response to CIRI's application, the Corps gave public notice on June 7, 1984, inviting comment on CIRI's application.

The National Marine Fisheries Service (NMFS) responded to the public notice of the Corps by letter under date of July 20, 1984. NMFS suggested to the Corps that the proposed project might have potentially significant impacts on marine resources in the vicinity of St. Matthew Island. Moreover, the NMFS recommended an analysis of alternatives to address both the human need for safety and support for exploration in the Navarin Basin, as well as the objective of preserving the pristine quality of the marine mammal habitat on the island. The NMFS suggested that alternatives considered include the use of existing facilities on St. Paul and/or St. Lawrence Islands. It also recommended that a full analysis of the proposal be undertaken to ensure that components of the total project not be permitted on an incremental basis. In the opinion of NMFS and EIS ought to be prepared pursuant to the National Environmental Policy Act (NEPA).

The Environmental Protection Agency (EPA) also responded to the Corps' public notice. The EPA expressed its concern with the "piecemealing" of the St. Matthew operation, and suggested the importance of reviewing the long range development scenario for the island. It also noted that although the potential environmental impact of support facilities had already been presented in the EIS for the Navarin Basin lease offering, a project-specific EIS was needed for consideration of site alternatives.

The relief sought by Audubon in A84–401 was a permanent injunction prohibiting CIRI from discharging any dredge or fill material on St. Matthew Island wetlands until authorization had first been obtained from the Corps.

On September 27, 1984, Audubon moved for a preliminary injunction in all three cases—the exchange case, the NEPA case, and the permit case.

STANDING

CIRI, as a preliminary defense in the exchange case, claims that the plaintiffs lack standing to bring the action. I reject this claim.

To establish standing under article III of the United States Constitution, the plaintiffs must allege "a distinct and palpable injury" resulting from the Secretary's decision to enter into the challenged land exchange; "a fairly traceable causal connection between that injury" and the Secretary's decision; and "a substantial likelihood that the relief requested will redress or prevent the injury."[13] Moreover, in order to satisfy the prudential limitations on standing established by the United States Supreme Court, and in order to establish standing to bring their claims under the Administrative Procedure Act, the plaintiffs must also demonstrate that their claims do not "rest ... on the legal rights or interests of third parties;" their injury is "not ... shared in substantially equal measure by all or a large class of citizens;" and the interests they are asserting are "arguably within the zone of interests [in-

---

12. *Id.*

13. *McMichael v. County of Napa,* 709 F.2d 1268, 1270 (9th Cir.1983) (citations omitted); *accord Kunaknana v. Clark,* 742 F.2d 1145, 1148 (9th Cir.1984); *Preston v. Heckler,* 734 F.2d 1359, 1363–65 & n. 5 (9th Cir.1984); *Scott v. Rosenberg,* 702 F.2d 1263, 1267–68 (9th Cir.1983).

tended] to be protected or regulated by that statute[s]," such as ANILCA, upon which their action is predicated.[14]

■ I conclude that the plaintiffs in the present action have satisfied all these requirements for standing. Audubon has alleged, and the defendants do not dispute, that at least thirty-five of their members have visited St. Matthew Island. These individuals claim an aesthetic, scientific, and recreational interest in the preservation of all of St. Matthew Island as an unchanged, undeveloped wilderness area. They claim that the Secretary's decision to transfer land on St. Matthew Island to CIRI will directly injure this interest, and that enjoining the exchange will prevent this injury from occurring. Moreover, they assert that the interest they claim is unique to them personally, is not merely an interest of "third parties" or the populace as a whole, and is "arguable within the zone of interests to be protected or regulated" by ANILCA and the other statutes upon which they are relying.

The three cases relied upon by CIRI to dispute Audubon's standing merely confirm the principles of standing elucidated above, and do not stand for the broad proposition claimed by the defendants. In each of these cases the plaintiffs had difficulty establishing standing or failed to state a cause of action because the plaintiffs could not satisfy the requirements for standing enumerated above. In *Kale v. United States*,[15] the Ninth Circuit held that the plaintiff, a disappointed applicant for a Native allotment, lacked standing to challenge the United States' conveyance to a third party of the land for which he had applied. The court concluded that the plaintiff was unable to establish that he was personally entitled to the land in question. Thus, the plaintiff could not demonstrate a "substan-

tial likelihood" that the relief he was seeking would prevent injury to his interests.

In *Raypath, Inc. v. City of Anchorage*,[16] the plaintiffs were renters of commercial office space in Anchorage. They sought tort damages against a charitable, nonprofit corporation which, they claimed, had rented office space in contravention of a land patent obtained from the United States and in violation of the federal statute under which the land had been authorized. The court ruled that the plaintiffs had no private right of action to pursue the claim.[17] The plaintiffs in *Raypath* could not demonstrate that the interests they were asserting were "arguably within the zone of interests to be protected" by the federal statute or the patent.

Finally, in *Rowe v. United States*,[18] this court held that the plaintiffs, who were unsuccessful applicants for federal oil and gas leases on the North Slope, had a "serious standing problem" when they sought to challenge land conveyances to the Arctic Slope Regional Corporation. In *Rowe*, as in *Kale*, the "plaintiffs' failure to establish a cognizable property interest in the lands" that were the subject of the dispute made their standing to bring the action questionable.[19] Thus, as in *Kale*, the plaintiffs in *Rowe* would have had difficulty demonstrating a "substantial likelihood" that the relief sought would prevent injury to their interests.

I conclude that none of the three cases relied upon by CIRI is relevant to the standing analysis in the present action. Audubon has alleged that its members' aesthetic, scientific, and recreational interests in the preservation of all of St. Matthew Island will be protected if the island remains in federal hands as part of the Alaska Maritime NWR. It is not necessary for Audubon to allege that its members

14. *McMichael*, 709 F.2d at 1270, *accord Glacier Park Foundation v. Watt*, 663 F.2d 882, 885 (9th Cir.1982); *Preston*, 734 F.2d at 1365 n. 6.

15. 489 F.2d 449, 454 (9th Cir.1973).

16. 544 F.2d 1019 (9th Cir.1976).

17. *Id.* at 1021.

18. 464 F.Supp. 1060, 1075 (D.Alaska 1979), *aff'd in part and rev'd in part*, 633 F.2d 799 (9th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

19. 464 F.Supp. at 1075, n. 77.

have a property interest in the island.[20] Moreover, the interest asserted by Audubon's members is "arguably within the zone of interests" protected by ANILCA and the other statutes upon which they rely. Therefore, I conclude that Audubon has standing to bring the present action.[21]

REVIEWABILITY OF THE SECRETARY'S PUBLIC INTEREST DETERMINATION

In its papers filed in connection with the summary judgment motions, CIRI argues that the Secretary's Public Interest Determination is not subject to judicial review. CIRI argues that the Ninth Circuit, under statutes virtually identical to ANILCA § 1302(h), has held that public interest determinations regarding land exchanges are "committed to agency discretion by law" and are not judicially reviewable under § 10 of the Administrative Procedure Act.[22] The principal case relied upon by defendants is *Lewis v. Hickel*,[23] a case which arose under the Taylor Grazing Act of 1934 as amended.[24] Claimants brought suit to overturn a decision of the Secretary rejecting their application for a private exchange of land under the Act.[25] Judge Wright, writing for the Ninth Circuit, concluded that the Secretary had authority to reject the application and refused to consider the claimants' contention that it was an abuse of discretion to do so: "[We] conclude that the determination of 'public interest' is one 'by law committed to agency discretion' and therefore unreviewable."[26]

CIRI suggests that the broad holding of *Lewis* has been reaffirmed in *National Forest Preservation Group v. Butz*.[27] If anything, I conclude that Judge Goodwin, writing for the court in that case, restricted the broad sweep of *Lewis*. He noted that although the basic decision whether to enter into a land exchange under the Taylor Grazing Act may be nonreviewable, judicial review may still be available on specific questions involved in the administrative determination.[28]

More recent authorities establish that agency public interest determinations are reviewable in several contexts. In *FCC v. WNCN Listeners Guild*,[29] the Federal Communications Commission was empowered, under the provisions of §§ 309(a) and 310(d) of the Communications Act of 1934, as amended,[30] to grant an application for a radio broadcast license transfer or renewal only upon a determination that "the public interest, convenience, and necessity" would be thereby served.[31] Under its informal rulemaking authority, the FCC issued a "Policy Statement" concluding that the public interest was best served by promoting diversity in entertainment formats through market forces and competition among broadcasters, and that a change in entertainment programming was therefore not a material factor to be considered by the Commission in ruling on an application for license renewal or transfer.[32]

On review, the Court of Appeals for the District of Columbia Circuit rejected the reliance on market forces to develop diver-

**20.** *See Stratman v. Watt*, 656 F.2d 1321, 1324 (9th Cir.1981).

**21.** *See id.; see also McIntyre v. United States*, 490 F.Supp. 830, 832–33 (D.Alaska 1980).

**22.** *See* 5 U.S.C. § 701(a)(2) (1982).

**23.** 427 F.2d 673 (9th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971).

**24.** 43 U.S.C. §§ 315 to 315o–1 (1982).

**25.** 427 F.2d at 674.

**26.** *Id.* at 676–77 (quoting § 10 of the Administrative Procedure Act, formerly codified at 5 U.S.C. § 1009).

**27.** 485 F.2d 408 (9th Cir.1973).

**28.** *Id.* at 411 (citing Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968).

**29.** 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1980).

**30.** 47 U.S.C. §§ 309(a), 310(d) (1982).

**31.** 450 U.S. at 584, 101 S.Ct. at 1269.

**32.** *Id.* at 585, 101 S.Ct. at 1269.

sity in programming as an unreasonable interpretation of the Act's public interest standard.[33] The United States Supreme Court granted certiorari and, after observing that the Federal Communications Act did not define the phrase "public interest, convenience, and necessity," reversed the Court of Appeals and upheld the FCC's Policy Statement: "Our opinions have repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference."[34] Moreover, under the Act, "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance."[35]

Judge Wright, again writing for the Ninth Circuit in *Keating v. Federal Aviation Administration*,[36] concluded that judicial review may be precluded only in those rare instances when statutes are drawn so broadly that in a given case "there is no law to apply."[37] In *Keating*, the court considered the validity of a regulation promulgated by the Federal Aviation Administration under the authority of § 601(c) of the Federal Aviation Act of 1958.[38] Under that provision, the Administrator was empowered to grant exemptions from the mandatory retirement "Age 60 Rule" if he found such action to be in the "public interest." Judge Wright concluded that the public interest standard contained in § 601(c) of the Act permitted judicial review of the Administration's determination.[39] As no adjudicative hearing had been held by the agency, the court adopted the arbitrary and capricious standard to review the agency decision.[40]

It is therefore quite clear that the presence of the term "public interest" does not by itself resolve the issue of reviewability. Saferstein, in his well-written, functional analysis on reviewability, suggests that the proper approach courts ought to adopt in reaching a decision concerning the scope of judicial review is to examine the extent to which judicial review may be consistent with the agency's function.[41] In this connection, it is important to review the controlling legislation for any expressions which may speak to the role of the judiciary. It is also important to look to the subject matter, purpose, background, legislative history, and practice of the general scheme entrusted by Congress to the agency. It is reasonable to suppose that as agency discretion broadens, judicial reviewability narrows, until the point is reached when discretion is so broad as to become unreviewable. That is, when Congress has vested an agency with absolute discretion, there remains no law to apply and judicial review is thus precluded.

■ I reject CIRI's contention that in this case the Public Interest Determination of the Secretary made pursuant to his land exchange authority under ANILCA § 1302(h) is unreviewable. The authority of the Secretary is subject to significant constraints: first, he may acquire lands only for the purposes of ANILCA; and second, in the exchange he must receive lands of equal value except that an exchange for other than equal value is permissible if it is in the public interest.[42] To explain the basis of his public interest determination, a secretarial document has been prepared setting out the reasons supporting the Secretary's decision to enter

**33.** *WNCN Listeners Guild v. FCC,* 610 F.2d 838 (D.C.Cir.1979), *rev'd,* 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1980).

**34.** 450 U.S. at 596, 101 S.Ct. at 1275.

**35.** *Id.* (quoting *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 810, 98 S.Ct. 2096, 2119, 56 L.Ed.2d 697 (1978).

**36.** 610 F.2d 611 (9th Cir.1979).

**37.** *Id.* at 612 (citing *Citizens to preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

**38.** Formerly codified at 49 U.S.C. § 1421(c).

**39.** 610 F.2d at 612.

**40.** *Id.*

**41.** Saferstein, *supra* note 28, at 396–98.

**42.** 16 U.S.C. § 3192(h) (1982).

into the land exchange. His decision rests on an underlying administrative record which is typical of records customarily reviewed by courts in the course of administrative review.

I conclude that the Public Interest Determination and the decisions of the Secretary in this case are reviewable. I conclude as well that the arbitrary and capricious standard, suggested by Judge Wright in *Keating*, is appropriate to review the Secretary's determination.

## REVIEW OF THE SECRETARY'S PUBLIC INTEREST DETERMINATION

Congress, when authorizing the Secretary to make land exchanges of unequal value when in the "public interest," did not impart what factors it intended the Secretary to consider in determining whether such exchanges are in the public interest. In his Public Interest Determination for the St. Matthew exchange, the Secretary identified the factors he considered. The Secretary read the standard broadly, considering possible benefits to the nation's economic vitality and oil production capabilities as well as to its wilderness values.

■ In reviewing the Secretary's public interest analysis, the question arises as to whether I should limit my inquiry to those factors the Secretary considered. I believe the Supreme Court's recent statements on

this issue in *Chevron U.S.A., Inc. v. NRDC* [43] instruct that I so confine my analysis.

In *Chevron*, an environmental group challenged the EPA's interpretation of a provision of the Clean Air Act Amendments of 1977.[44] In upholding the agency's interpretation, the court noted that when Congress has not directly addressed the precise definition of particular statutory language, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." [45] Rather, if the statute is silent or ambiguous with respect to the specific interpretation, "the question for the court is whether the agency's answer is based on a *permissible construction* of the statute." [46]

I conclude that the Secretary's broad view of the public interest in the context of land exchanges is a reasonable and permissible construction of ANILCA § 1302(h)'s statutory language.[47] "Public interest" exchanges under ANILCA are exceptions to the general congressional requirement that the Secretary only enter into exchanges of equal monetary value. It therefore was reasonable for the Secretary to conclude that Congress intended that he take non-monetary benefits into account in determining whether the overall public interest would be furthered by an exchange.[48]

---

**43.** —— U.S. ——, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**44.** Specifically, the NRDC challenged the EPA's interpretation of the term "stationary source" in the statute. EPA adopted a plantwide definition of this term which the environmental group challenged as contrary to the Clean Air Act's overall purposes. *See id.*, 104 S.Ct. at 2780–81.

**45.** *Id.* at 2782.

**46.** *Id.* (emphasis added).

**47.** I note here that in the *Chevron* case, the Court declared that in reviewing an agency's interpretation of such statutory language, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 2782 n. 11.

**48.** Although I believe the Secretary's construction of § 1302(h)'s "public interest" language is a reasonable one, I have found the Court's earlier statements in *NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), to require the Secretary to take special note of the purposes of ANILCA in making his public interest analysis. In that case, the Court stated that "[t]his Court's cases have consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general welfare. Rather, the words take meaning from the purposes of the regulatory legislation." *Id.* at 669, 96 S.Ct. at 1811. The Court noted that in order to give meaning to the words "public interest" as used in regulatory statutes, "it is necessary to look to the purposes for which the Acts were adopted." *Id.* The Court made clear in *NAACP v. FPC* that although a given act may have myriad "subsidiary purposes," its primary objectives must guide any public interest determination required under the statute's provisions. *Id.* My review of the Secretary's deci-

In broad terms, the Secretary stated that his Public Interest Determination was based on a "qualitative comparison of the temporary short-term loss of approximately 4,110 acres of wildlife and wilderness habitat on St. Matthew Island with the permanent addition of over 14,000 acres of wildlife habitat to the NWR System." Thereafter he summarized the seven major reasons upon which he rested his determination.

I conclude that the broad discretion given the Secretary under § 1302(h) authorizes him to determine those interests which are to be considered in arriving at what is in the public interest. It is by now also well established that the court may not attempt to substitute its judgment for that of the Secretary. Rather, review of the Secretary's determination must focus on whether the decision rests on an adequate record and was reached after consideration of all relevant factors.[49]

In his Record of Decision, the Secretary identified the documents which were relevant to the exchange and which were incorporated by reference into the record. Since the exchange involved an action leading to conveyances to Native corporations pursuant to ANILCA, the Secretary concluded that no environmental impact statement was required. Had he chosen to, he could have considered the DEIS for the Navarin Basin published in June of 1983. The DEIS contained a good deal of information in connection with the potential use of St. Matthew Island as a support base for oil exploration and production. He could, as well, have reviewed the DEIS concerning environmental impacts resulting from use of lands on St. Matthew Island for those purposes. Nevertheless, the Secretary requested the Fish and Wildlife Service to prepare a "Final Ascertainment Report" which specifically considered the environmental consequences of the land exchange. I am satisfied, based upon my examination of the Ascertainment Report, that the doc-

ument provides an adequate record upon which the Secretary could base his qualitative comparison of benefits and injuries resulting to the wildlife and wilderness habitat from the exchange. I consider the DEIS only to the extent that the document is helpful in understanding the background leading up to the land exchange.

*Prospective Benefits to Wildlife Conservation and Public Recreation*

The Secretary declared in his documents of decision that the administrative record demonstrated that the St. Matthew land exchange would clearly result in a "net benefit" to national wildlife and conservation values. He stated that a primary reason for his approval of this particular exchange was the remoteness of the possibility of danger to St. Matthew's environmental resources and the temporary quality of any potential environmental disruption. Conversely, he found that the prospective environmental and recreational benefits that the government would acquire in the Kenai and Yukon Delta NWRs would advance wildlife conservation values in both the short and long terms. Additionally, he concluded that CIRI's proposed use of St. Matthew for an oil support base would be compatible with the purposes of the Alaska Maritime NWR, as required by ANCSA § 22(g).

The Land Interests Conveyed to the United States *The Kokechik Bay Nondevelopment Easement:* In terms of acreage, the largest acquisition by the Secretary in the exchange amounts to approximately 8,000 surface acres of waterfowl nesting habitat within the Yukon Delta NWR. Recognizing the importance of this nesting region in Alaska, Congress declared a primary purpose of the Yukon Delta NWR to be "to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, shorebirds, seabirds, whistling swans,

---

sion documents has convinced me that the Secretary sufficiently considered the environmental purposes of ANILCA in formulating his public interest determination.

**49.** *Confederated Tribes & Bands v. F.E.R.C.,* 746 F.2d 466 (9th Cir.1984).

emperor, white-fronted and Canada geese, black brant and other migratory birds." [50]

The location of the nondevelopment easement is in Kokechik Bay and the land is owned by Sea Lion Corp. The nondevelopment easement conveyed by Sea Lion to the Secretary under the exchange provided in part for the following rights:

(a) the right of GRANTEE, in perpetuity, to prevent and prohibit GRANTOR, its successors and assigns, from developing *docking facilities, roads, canals, airstrips, utilities, transmission lines, pipelines, tank facilities, structures not used for susbsistence purposes, or excavations* or other topographical changes: *Provided,* that development on the Real Estate may be permitted with the prior written consent of the Secretary of the Interior or his designee.

. . . .

(c) GRANTOR's covenant running with the land not to permit, authorize, or consent to the use of the Real Estate for purposes of exploration, development, or extraction of the subsurface estate underlying the Real Estate (where such power of permission, authorization or consent is necessary under law for subsurface use), unless such exploration, development, or extraction is expressly agreed to by GRANTEE.

Kokechik Bay is located in the Yukon-Kuskokwim Delta area of Alaska. The bay is separated from the Bering Sea by a low sandy spit and a similar barrier island. The easement lands are located along the southern shore of the bay within a flat band of low tundra up to three miles wide. At least half of this area is water in the form of tidal sloughs, ponds, and lakes. The average daily temperature ranges from 11 degrees F. during February to 49 degrees F. during July and August.

The lands subject to the nondevelopment easement contain excellent waterfowl nesting and brood rearing habitat. The most dense nesting concentrations of emperor geese are found in this area.[51] In addition, the Kokechik Bay region is the breeding ground for half the world's population of black brant.[52] Cackling Canada geese also breed chiefly in the areas surrounding Kokechik Bay.[53]

There can be absolutely no doubt that the lands subject to the nondevelopment easement are important to conservation and management objectives in protecting the black brant and the cackling Canada and emperor geese. The inquiry does not stop here, however. The Secretary's determination that the St. Matthew exchange is in the national interest rests in substantial part upon his conclusion that the nondevelopment easement acquired in Kokechik Bay added significant environmental protections in this region.

The environmental protections in place prior to the St. Matthew exchange reveal that the lands made subject to the nondevelopment easement are for the most part located within the Yukon Delta NWR. As such, they are already governed by the requirements of § 22(g) of ANCSA. This provision provides, in pertinent part, that:

Notwithstanding any other provision of this chapter, *every patent* issued by the Secretary pursuant to this chapter—which covers lands lying within the boundaries of a National Wildlife Refuge on December 18, 1971—*shall contain a provision that such lands remain subject to the laws and regulations governing use and development of such Refuge.*[54]

---

**50.** ANILCA § 303(7)(B), 16 U.S.C. § 668dd note (1982).

**51.** The total world population of emperor geese is estimated at 90,000 to 95,000. This entire population is found in the Bering Sea region in which Kokechik Bay is located.

**52.** It is estimated that 14,000 black brant nested in the Kokechik Bay area in 1981, and an estimated 15,000 nested there in 1982.

**53.** The number of cackling Canada geese nesting in the Kokechik Bay area has been declining in recent years, and is currently estimated at 45,000.

**54.** 43 U.S.C. § 1621(g) (1982) (emphasis added).

838

When the Secretary conveyed these lands to CIRI, he imposed covenants, pursuant to § 22(g)'s requirements, that subjected almost all of the lands to the laws and regulations of the NWR system. The laws and regulations governing use and development of wildlife refuges provide that only activities which are "compatible" with the major purposes for which a particular refuge was established may be permitted by the Secretary.[55] Although compatibility is not expressly defined in either the National Wildlife Refuge System Administration Act [56] or ANILCA, implementing regulations for the administration of § 22(g) covenants expressly provide that compatibility means that proposed uses must not *"materially impair* the values for which the refuge was established." [57]

My reading of the language of § 22(g), which the Secretary properly inserted into the Kokechik Bay conveyances to CIRI, suggests to me that these lands were already protected from incompatible uses without the nondevelopment easement obtained by the Secretary. To this extent, I agree with Audubon's claim that the protections acquired under the easement were "redundant" of the environmental safeguards obtained through the § 22(g) covenants.

In this connection, the Secretary suggests in his Public Interest Determination that the nondevelopment easement on CSU lands (Kokechik Bay) will provide secure protection "against the vagaries of section 22(g)" of ANCSA and eliminate the risk that the lands transferred and relinquished by CIRI would be developed in a manner inconsistent with CSU objectives. The Final Ascertainment Report discloses that the primary federal statute governing the management of national wildlife refuge resources is the National Wildlife Refuge

System Administration Act of 1966.[58] Section 4(d) of the Act authorizes the Director of the Fish and Wildlife Service to permit a wide array of development activities within national wildlife refuges provided that such activities are found to be compatible with the purposes for which a given wildlife refuge was established. In applying the test for compatibility, the proposed activity must be judged and its anticipated impacts assessed against the purposes for which a given refuge was established. Section 22(g) of ANCSA retains this "compatibility test" for lands selected by and conveyed to Natives within wildlife refuges in Alaska.

The nondevelopment easement prohibits Sea Lion from constructing docking facilities, roads, canals, airstrips, utilities, transmission lines, pipelines, tank facilities, and other structures not used for subsistence purposes, or excavating or making other topographic changes. Given the purpose for which the Yukon Delta NWR was established, there would seem to be considerable doubt as to whether docking facilities, roads, canals, airstrips, utilities, pipelines and the like would be compatible uses of the Kokechik Bay lands. Apart from that, the easement lands are located along the southern shore of Kokechik Bay within a flat band of low tundra up to three miles wide which extends from the water's edge to an undulating line of bluffs. At least one-half of this area is water in the form of tidal sloughs, ponds, and lakes. The primary human impact in the Kokechik Bay lowlands has always been egg collecting and spring hunting by Alaskan Natives. That is, the Kokechik Bay lowlands are very important for subsistence uses by Native peoples. Certainly the sort of development precluded by the nondevelopment easement, if not so precluded, would have to be considered under §§ 801(4) and 802(1)

55. *See* ANILCA § 304(b); 16 U.S.C. § 668dd(d)(1)(A) (1982); 50 C.F.R. § 29.3 (1984).

56. 16 U.S.C. § 668dd(d) (1982).

57. 43 C.F.R. § 2650.4–6(b) (1982) (emphasis added).

58. 16 U.S.C. § 668dd (1982).

of ANILCA[59] for the possible impact on subsistence users.[60]

Finally, there is nothing that I have discovered in the Final Ascertainment Report that suggests the existence of any probable or even potential threat of the kind of development prohibited by the nondevelopment easement. To the extent this matter is considered at all, the Final Ascertainment Report acknowledges that while the compatibility test of § 22(g) could be expected to preclude several types of development activities on the Kokechik lands, a number of other types of development activities could probably be found to be compatible if carefully managed. In sum, there is nothing in the Final Ascertainment Report that suggests any likelihood of future construction or operation of docking facilities, roads, canals, airstrips, utilities, transmission lines, pipelines, and tank facilities at Kokechik Bay. Nor is there anything in the DEIS or any other source that has been brought to my attention that suggests the construction of such facilities is now either contemplated or projected. Thus it would be hard to find a more striking comparison between the potential or probable use of Kokechik Bay lowlands and the proposed use of CIRI's inholdings on St. Matthew Island. On St. Matthew Island, construction of the type of facilities that would be barred by the nondevelopment easement in the Kokechik Bay lowlands is both certain and immediate.

Apart from the protection provided by § 22(g), other provisions of law ought to be considered in determining the actual extent of the increased protection the Secretary acquired for Kokechik Bay in the exchange. Section 404 of the Clean Water Act,[61] which Audubon has asserted regulates the St. Matthew lands conveyed to CIRI, requires anyone seeking to commence development activities upon "wetlands" to obtain a permit from the Army Corps of Engineers. Such a permit request generally requires the Corps to prepare an EIS under the provisions of NEPA.[62] Thus this statute provided additional protection to Kokechik Bay.

Mention has been made of the subsistence use made of Kokechik Bay lowlands by Alaskan Natives. The easement conveyed to the Secretary ensures that subsistence uses are to be protected. However, provisions of ANILCA already expressly protected subsistence uses prior to this land exchange:

> Congress's intention to protect subsistence uses by rural residents of Alaska is repeatedly and strongly stated in [ANILCA], itself. It was a stated general purpose of [ANILCA], "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." Section 101(c), 16 U.S.C. § 3101(c).[63]

In sum, I have concluded that contrary to the Secretary's statement in his Public Interest Determination, the nondevelopment easement obtained under the exchange does not materially increase the environmental protections already in place for Kokechik Bay. Hence, the Secretary's conclusion that the acquisition of the nondevelopment easement significantly advances long term CSU and general wildlife conservation and management objectives is not borne out when the land status and legal restrictions otherwise applicable are examined. *The Nunivak Island Relinquishments:* In addition to the Kokechik Bay nondevelopment easement, CIRI agreed to relinquish approximately 1100 acres of ANCSA selection rights on Nunivak Island. Nunivak Island is located in the Bering Sea off the western coast of Alaska and has a total of over one million acres. It is separated from the mainland in the vicinity of the Yukon-Kuskokwim delta by the 23-mile-wide Etolin Straits.

The island was first established as a NWR in 1929 to provide a habitat for a

---

**59.** 16 U.S.C. § 3111(4); 16 U.S.C. § 3112(1).

**60.** *People of the Village of Gambell v. Clark,* 746 F.2d 572 (9th Cir.1984).

**61.** 33 U.S.C. §§ 1341–1345 (1982).

**62.** *See generally id.; see also* NEPA, 42 U.S.C. § 4332 (1982).

**63.** *People of the Village of Gambell v. Clark,* 746 F.2d 572, 580 (9th Cir.1984).

herd of Greenland musk ox which could be used for reestablishment on their former range in Alaska. The island is now part of the Yukon Delta NWR, the same refuge in which Kokechik Bay is located. As such, Congress had declared the conservation of its abundant wildlife to be one of its primary objectives. In addition to musk ox, the island is home to numerous land mammals, marine mammals, whales, seabirds, and migrating waterfowl. Evidence of human presence in the Nunivak wilderness area consists of remains of Native villages, fishing and hunting camps, and cemeteries. All of the Nunivak Natives now live in the consolidated village of Mekoryuk.

Under the exchange agreement, CIRI relinquished its claims, made under ANCSA § 14(h),[64] to 109 parcels scattered around the perimeter of Nunivak Island. To determine the measure of increased environmental protection the Secretary acquired under the St. Matthew exchange, it is necessary to briefly review the scope of wilderness protection that § 14(h) already provided.

Section 14(h) of ANCSA authorizes the Secretary to convey to the Natives a total of two million acres of public lands for miscellaneous purposes. The Secretary has allocated these two million acres among the Native regional corporations and other groups.[65] The regulations thus establish each corporation's "entitlement," that is, the number of acres to which it is entitled. Each corporation selects lands that it wants to acquire under this entitlement. If a corporation selects more lands than it is entitled to receive, the Secretary may require it to set priorities among its selections.[66] The Secretary determines what selected lands are to be conveyed on the basis of these priorities.

In addition, the implementing regulations for § 14(h) give the Secretary broad discretion to deny conveyance of lands claimed by Native corporations when such lands are located in wildlife refuges. A site may not be conveyed under § 14(h) unless the Secretary has determined that the site qualifies as a cemetery or historical site; that the site offers unique values; and that conveyance would not disrupt fish and wildlife populations or habitats, or their management.[67]

The Secretary's regulations provide that every conveyance issued under § 14(h) must contain a convenant that the site will be maintained and preserved solely as a historic place or cemetery. The Native corporation may not allow any mineral development, including oil extraction, on the site. Use of the land must comply with the strict rules governing the National Register of Historic Places, which prohibit uses that are inconsistent with a site's historical character.[68]

In attacking the St. Matthew exchange's validity, Audubon suggests that the Secretary improperly assumed CIRI would have been entitled to all its § 14(h) claims. I shall defer to the Secretary's assumption that the Native corporations would have been entitled to the full complement of § 14(h) interests ultimately relinquished under the terms of the exchange. Even accepting this assumption, however, it is apparent that the exchange provided only minimal additional environmental protection over that already conferred by § 14(h).

The impact of the exchange on Nunivak Island ANCSA selection sites is described in the Final Ascertainment Report. The report states that the exchange will have essentially no effect on the use of the Nunivak lands. No present or future provisions for development are perceived for these § 14(h) sites, nor does it appear that large numbers of people may visit the sites to alter the soils and vegetation. At best, the report observes that there is a *possibility* these sites could be used or developed in a way that conflicts with FWS manage-

**64.** 43 U.S.C. § 1613(h) (1982).

**65.** 43 C.F.R. § 2653.1 (1982).

**66.** *Id.* § 2653.10.

**67.** *Id.* § 2653.5.

**68.** *Id.* §§ 2653.5, 2653.11(b); 36 C.F.R. § 800 (1984).

ment goals. In view of what is presently known, that possibility is remote. As with the Kokechik Bay interests, there is no evidence in the record suggesting any significant likelihood of future oil development activities in these areas. And even if there were such a threat, § 14(h) of ANCSA explictly prohibits oil development activities on § 14(h) lands.[69]

In addition to the significant § 14(h) development restrictions, these interests would also have been subject to the requirements of ANCSA § 22(g). The § 22(g) covenants that would have accompanied the Nunivak Island conveyances to CIRI would have permitted only Native activities which were compatible with the environmental protection objectives of the Yukon Delta NWR.

The strong shield of environmental protection that ANCSA § 14(h) and § 22(g) would have provided suggests that the St. Matthew exchange added little to long term conservation objectives. Concerning the furtherance of wildlife management goals, it is theoretically true that potential inholdings were avoided on Nunivak Island. However, this management benefit would be offset by the exchange's creation of the St. Matthew Island parcel as a major inholding in the Alaska Maritime NWR. Overall, I must conclude that the Secretary's finding, that the acquisition of the Nunivak Island interests furthered CSU and wildlife goals, is without basis in the record.

*The Kenai Peninsula Interests:* Along with the Kokechik Bay nondevelopment easement and the Nunivak Island interests, CIRI relinquished claims in the Kenai NWR. As with the Yukon Delta NWR in which Kokechik Bay and Nunivak Island are situated, wildlife conservation is a primary purpose of the Kenai NWR.[70] In addition, Congress has sought, by the creation of this refuge, "to provide, in a manner compatible with [the refuge's environ-

mental protection] purposes, opportunities for fish and wildlife-oriented recreation."[71]

As part of the exchange, CIRI relinquished 2254 acres of its entitlement under ANCSA § 14(h) within the Kenai NWR. Additionally, it relinquished its claim under Public Law 94–204[72] to the surface estate of lands adjacent to the Kasilof River and Tustemena Lake, also located in the Kenai NWR. All of these lands acquired in the Kenai NWR are located on Kenai Peninsula rivers which receive high fishing use. Consistent with the refuge's public recreation objectives, many visitors currently use this area to beach their boats, fish, picnic, hunt waterfowl, and camp.

Of the approximately 5000 acres of land the Secretary prevented from becoming inholdings in the Kenai NWR, slightly less than half of these interests were already subject to the compatibility requirements of ANCSA §§ 14(h) and 22(g). As noted earlier, the existence of these provisions means that there would have been minimal additional wilderness conservation benefits realized under the St. Matthew exchange.

There is little doubt that the Secretary's acquisition of the surface estate in the Tustemena region provided some assurance that these lands would remain accessible for traditional recreational uses. There is no evidence in the Final Ascertainment Report, however, that suggests that public access to this area is currently threatened or would be threatened were CIRI to have acquired these interests. Nonetheless, I believe it reasonable to assume that the exchange's prevention of this possibility afforded substantial benefit to the recreational objectives of this refuge. I therefore find that the Secretary's conclusion that the exchange was in the public interest "in terms of advancing the objective of public enjoyment of CSUs" was not arbitrary and capricious according to the evidence before him.

**69.** *See* 43 C.F.R. § 2653.11(b) (1984).

**70.** ANILCA § 303(4)(B)(i).

**71.** *Id.* § 303(4)(B)(v).

**72.** Pub.L. No. 94–204, 89 Stat. 1145 (1976).

*Potential Dangers to St. Matthew Island's Wilderness Values*

In concluding that relinquishing lands on St. Matthew Island to CIRI for use as an oil support facility was in the public interest, the Secretary assumed that there was little possibility of long term environmental danger to the island's unique wilderness values. Being mindful of the narrow confines of the standard of review in this case, I nevertheless have found this determination fails to consider the relevant facts in the Secretary's own administrative record. My review of the record has also led me to conclude that the Secretary's determination that the placement of an oil support facility within the Alaska Maritime NWR would be compatible with this refuge's strict environmental objectives was a clear error of judgment.

The Alaska Maritime NWR was created for the express purpose of "conserv[ing] fish and wildlife populations and habitats in their natural diversity." [73] Congress considered protection of St. Matthew Island's environmental resources to be so important that it designated the island as a national wilderness area within a wildlife refuge, granting St. Matthew the highest order of federal environment protection. [74]

The DEIS for the Navarin Basis Lease Offering acknowledges the unique natural beauty of this pristine area.

St. Matthew Island contains a number of values which make the island an outstanding wilderness area in the context of the Wilderness Act of 1964. The wilderness act defines wilderness as an area primarily affected by the forces of nature (naturalness), providing outstanding opportunities for solitude and primitive and unconfined recreation, containing at least 5,000 acres, and ... other values of significance.

St. Matthew Island, containing about 128 square miles, has primarily been affected by the forces of nature. The island has been uninhabited by man since prehistoric times; however, short term uses of the island have occurred. The most visible evidence of man's presence are the remains of a small World War II meteorological-navigational installation and the remains of a few fox trapper shelters erected prior to World War II. Other than these minor remains of man's presence, the island is primarily natural in appearance.

Isolation and remoteness are the main factors which contribute to the island's ability to provide outstanding opportunities for solitude. The island is more than 170 miles from the nearest landfill, and is distant from shipping lanes and aircraft routes which adds to the area's isolation. The near absence of air traffic over the island is lacking in all but a few other wilderness areas. Because of the isolation and remoteness, the island, with its rugged and varied terrain and arctical-pine vegetation, offers a primitive experience to recreationists visiting the island. Currently visitation is extremely low. The island's wildlife and scientific values also supplement the naturalness, solitude and primitive recreational values of the island. St. Matthew Island supports one of the richest seabird nesting colonies in the world with as many as 5 million seabirds nesting on the island during breeding season. Unique birdlife on the island include the Pribilof Gray-crowned Rosy Finch. McKay's Snowbunting nest only on St. Matthew Island. Unique mammals include the St. Matthew Vole ... Walrus, Arctic Fox and many other species of mammals occupy the island. At one time, the island supported one of the densest concentration of polar bears in the world until they became extinct from overhunting in the nineteenth century ...

Section 22(g) of ANCSA, in conjunction with § 304(b) of ANILCA, permits the Secretary to allow only those activities in natural wildlife refuges which are "compatible"

---

73. ANILCA § 303(1)(B).

74. St. Matthew Island was designated a wilderness area on October 23, 1970. Pub.L. No. 91–504, 84 Stat. 1104 (1970).

with the major purposes for which a particular refuge was established. Although CIRI has suggested § 22(g) does not apply to ANILCA land exchanges, the federal defendants have taken the position that § 22(g)'s compatibility requirements do apply to such land exchanges. They contend that under this provision the Secretary is only required to ensure that a given exchange agreement includes the requisite "refuge compatibility" language of § 22(g). This language was essentially included in the St. Matthew Island exchange agreement.

Audubon argues that under § 22(g) the Secretary was required to make a formal "refuge compatibility" determination prior to his approval of the exchange. Although the Secretary claims that § 22(g) does not require that he make an affirmative compatibility determination, he concedes that such a determination was voluntarily made for the St. Matthew exchange. The federal defendants suggest that the "Land Use and Restoration Stipulations" contained in the exchange agreement constituted an implicit refuge compatibility determination. Additionally, the Secretary's conclusion that the construction of an oil support base was compatible with the purposes of the Alaska Maritime NWR under the exchange agreement's terms was noted in his Public Interest Determination as well as in correspondence from FWS Regional Director Robert Putz to CIRI on August 30, 1984.[75]

I conclude that on the face of the underlying record, the Secretary's assumption that CIRI's intended use of St. Matthew as an oil base was compatible with the purposes of the Alaska Maritime NWR is a clear error of judgment. Indeed, contrary to the Secretary's repeated descriptions of the potential environmental damage to St. Matthew's unique wilderness values as "temporary" and "remote," the administrative record reveals there is a substantial risk of significant short and long term injury to the island's wilderness qualities. Such prospective environmental degradation would inexorably conflict with the express goal of the Alaska Maritime NWR to conserve the abundant wildlife populations and habitats of this refuge in their "natural diversity."

The Secretary's Final Ascertainment Report reveals that CIRI will fill 300 acres of tundra on St. Matthew Island for roads, runways, and buildings, using over one million cubic yards of gravel mined from the lands and lagoons of the island. The report also states that CIRI's activities will pollute St. Matthew's air with the smoke and fumes of jet engines, ships, motor vehicles, diesel generators, and solid waste incinerators. Significant risks of oil spills, with their attendant contamination of the island's ecosystem, are also noted.

The most ominous potential environmental destruction that might accompany development on St. Matthew will affect wildlife, however. By FWS estimates, hundreds of thousands of seabirds nest in colonies on or immediately adjacent to the lands conveyed to CIRI. FWS found that at least "13% of the *minimum estimate* for nesting seabirds on the island" may be adversely affected by development on St. Matthew. FWS warned that much or all of the population of murres and kittiwakes on the island, which constitute a major component of the area's entire bird population, may be endangered by CIRI development, for "any added disturbance could be critical to [their] survival." Most alarmingly, FWS has estimated that the project will adversely affect nearly half a million nesting seabirds for a period of 80 to 100 years.

Of particular concern, both the FWS report and DEIS point to the frequent air traffic that will feed the support facility as especially dangerous to St. Matthew's seabird nesting colonies. Near flying aircraft inhibit breeding and initiate panic flights,

---

**75.** *See* Plaintiffs' Consolidated Motions for Preliminary Injunction, Exhibit 3, wherein Regional Director Putz informed CIRI that its proposed plan for support base construction on St. Matthew would not result in any significant damage to St. Matthew's wildlife and seabird populations. At oral argument on October 22, 1984, counsel for the government stated that this letter constituted a refuge compatibility determination by the Secretary.

potentially causing entire colonies to take to the air, knocking eggs and chicks into the ocean or leaving them vulnerable to predators. Continued disruption may cause reproduction failure, and, in the worst case, colonies may be totally abandoned.

The effects of such disturbances are so serious that FWS has consistently required aircraft to give wide berth to the nesting colonies on St. Matthew Island. In advising the Minerals Management Service on the Navarin Basin Lease Sale, FWS required that aircraft remain outside the 12 mile contiguous zone around St. Matthew to prevent disturbance of bird rookeries. Similarly, in reviewing the Atlantic Richfield Company's proposal to anchor a barge off St. Matthew to support its oil well drilling last summer, FWS insisted that aircraft stay at least three miles from the island to protect the fragile bird population.

At the peak of CIRI's activities on St. Matthew, there will be approximately 30 to 40 flights to and from the island each day, mostly by helicopters. If these flights all remain within the flight corridors designated in the exchange agreement, they will disrupt many thousand of seabirds. Most importantly, it is pointed out that through most of the nesting season on St. Matthew, the island is enshrouded in fog, and thus, as the DEIS notes, it is likely that flights will stray from these corridors. Such transgressions, perhaps necessary to protect human lives, could affect other colonies of nesting seabirds. Indeed, anticipating the likelihood that weather conditions on St. Matthew may prevent use of designated flight corridors, the exchange agreement provides that aircraft may depart from these corridors whenever necessary for human safety.

In addition to a potential for serious long term degradation to the seabird population of St. Matthew, the DEIS reveals that any major oil spill near the island is likely to cause substantial harm to the many whales that inhabit the island's waters. By the FWS's own estimates, a major oil spill near the island is probable if pipelines eventually are used to transport oil to St. Matthew.

Although all of these facts appear on the face of the administrative record, the Secretary paid scant heed. Rather, he suggests in his Public Interest Determination that the St. Matthew Island stipulations for restoration and reconveyance assure that the land will be restored and returned to the National Wildlife and Wilderness System when use of the land as a support base for oil exploration or development comes to an end. He refers to the land transaction as a "temporarily conveyed use of federal ownership" and to the "temporary wildlife disruption authorized on St. Matthew Island" under the land use stipulations. He reasons that the exchange is in the public interest in terms of advancing the objectives of public enjoyment of CSUs by allowing public use of the Tustamena Lake campgrounds and the area at the confluence of the Russian River-Kenai River for camping, fishing, hiking, and nature observations. This is achieved while only "temporarily" disposing of isolated St. Matthew Island land which has virtually no recreational potential whatsoever.

The word "temporary" standing alone has little meaning. It largely depends for its context upon the frame of reference in which it appears. The exchange provides by its terms that the conveyance to CIRI is for 50 years, or if oil and gas have been produced in the Navarin Basin and the land has been used in connection therewith, then so long as may be necessary for completion of production. What is important are the consequences upon wildlife and wilderness habitats by the activity associated with the use of the land, and not whether that use may be characterized as "temporary." The Secretary has in fact avoided consideration of the many relevant facts appearing in his own Final Ascertainment Report detailing the environmental impacts upon wildlife and wilderness resources in the Alaska Maritime NWR which will be brought about by the proposed use of the land on St. Matthew Island. In sum, the Secretary, in making his qualitative comparison of the "temporary" short-term loss of 4,110 acres

of wildlife and wilderness habitats on St. Matthew Island, has failed to consider most of the facts disclosed in the Final Ascertainment Report bearing on use of the land for a supply base.

It is significant as well that while the land exchange is said to provide added protection to the wildlife habitat in the NWR system, the Final Ascertainment Report fails to disclose any threat of potential or probable incompatible uses of the land interests conveyed to the United States in the exchange. The only clear benefit identified is the enhanced recreational use in the Kenai NWR. Indeed, the only certain and immediate impacts upon any wildlife and wilderness habitats within the NWR system are due directly to and arise out of the land exchange itself.

As it presently stands, the FWS Regional Director has implicitly approved the construction of a 3,000 foot by 100 foot gravel airstrip with an associated 400 foot by 400 foot gravel pad for a camp, and possibly 9,000 feet of connecting roadway to be constructed within CIRI's inholdings on St. Matthew Island. The Secretary suggests that under the stipulations of the land exchange agreement, the Regional Director can influence St. Matthew Island development through review of CIRI's plan of operations. He may also recommend strategies to minimize harm during development or, if development is causing substantial damage to wildlife resources, he can seek judicial review.

It is correct that the stipulations are useful to minimize harm to the wildlife and wilderness habitat on St. Matthew Island, but the stipulations cannot otherwise justify the Secretary's Public Interest Determination. That is, the Secretary cannot avoid consideration of potential environmental impacts upon wildlife or wilderness habitats within the refuge resulting from construction and operation of the support base by suggesting that the stipulations will serve to mitigate the extent of the injury brought about by environmental impact.

Finally, the Secretary cannot in support of his Public Interest Determination justify the possibility that future regulatory efforts will serve to ensure protection of the St. Matthew Island wildlife and wilderness resources.

> After major investment of time and money it is likely that more environmental harm will be tolerated.[76]

■ The record thus demonstrates that, directly contrary to the Secretary's findings, overall national wildlife conservation and management objectives will not be advanced either in the short or long terms under the exchange. Nor can speculative increases in protection of public access to rivers in the Kenai peninsula for recreational purposes significantly mitigate the sure and certain conflict with the conservation purposes of the Alaska Maritime NWR.

*Other Factors Considered By The Secretary In His Public Interest Determination*

In addition to claimed wildlife conservation benefits and recreational gains acquired under the exchange, the Secretary notes several other benefits which, he believes, further establish that this land transaction is in the public interest. He observes that CIRI's intended use of "strategically located" St. Matthew Island for a staging area for Navarin Basin energy development "offers substantial environmental, human safety and economic public interest benefits." Moreover, the exchange "promotes the expeditious settlement of Alaska Native land claims ... and eliminates costs associated with federal conveyancing and management of unconsolidated parcels."

There is little evidence in the administrative record which supports the Secretary's conclusions on these claim benefits. With regard to possible economic and efficiency

**76.** *Environmental Defense Fund v. Andrus,* 596 F.2d 848 (9th Cir.1979) (citing *Lathan v. Volpe,*  455 F.2d 1111 (9th Cir.1971).

benefits to the ANCSA conveyancing process, for example, the Secretary relies upon the affidavit of Beaumont McClure, an official of the Bureau of Land Management. In the affidavit, this official states that the Secretary was able to save adjudication expenses of more than one-half million dollars by avoiding the need to adjudicate the validity of the Natives' ANCSA § 14(h) selections. Additional savings resulted from avoiding the costs of surveying and ultimately conveying the surface acreage claims that CIRI relinquished as part of the St. Matthew exchange. Yet there was apparently no consideration of whether these possible savings were outweighed by the costs associated with negotiating the land exchange, or, more importantly, by the potential value lost in national assets through this monetarily unequal transaction.[77] Even assuming these speculative miscellaneous benefits were sufficiently supported in the record, I conclude the Secretary's decision is flawed for failure to consider the many relevant facts contained in the administrative record.

CONCLUSION

I conclude that the Secretary's Public Interest Determination for the St. Matthew Island exchange suffers from serious errors of judgment and misapplication of law which have led to a clear error of judgment.

My review of the underlying record has convinced me that the Secretary, by failing to consider the protections otherwise provided by law and by failing to consider relevant facts appearing of record, seriously misconstrued the benefits to CSU and general wildlife conservation and management objectives advanced by this exchange. Additionally, by characterizing the effects on St. Matthew Island as temporary and by erroneously assuming that the land use stipulations would provide sufficient protection to wildlife and wilderness habitats,

the Secretary failed to properly consider the likely negative effects caused by environmental impacts on St. Matthew Island. Finally, the Secretary's determination under ANCSA § 22(g) that a support base located within the Alaska Maritime NWR would be compatible with the environmental protection purposes of this refuge is contrary to the underlying record. The Secretary's Public Interest Determination thus constitutes a clear error of judgment.

I conclude that the St. Matthew Island land exchange is invalid. I also conclude that Audubon's application for a preliminary injunction in case A84–402 (the NEPA case) must be granted. My conclusion that the exchange is invalid demonstrates both Audubon's "strong likelihood of success on the merits," and that an injunction would serve the public interest. Audubon has documented the irreparable injury that would occur on St. Matthew should development be permitted. Thus the requirements for granting injunctive relief are satisfied.[78] Audubon is entitled to a preliminary injunction to prohibit any construction or other use of heavy equipment on St. Matthew Island.

In case A84–401 (the permit case), I conclude that Audubon's request for relief is premature. At this time, the Army Corps of Engineers has not yet made a final decision on CIRI's application for a permit. Until such decision is made, it is premature for Audubon to be seeking relief in this court.

IT IS NOW ORDERED:

In case A83–425, Audubon's Motion for Summary Judgment is GRANTED, and the defendants' Motion for Summary Judgment is DENIED.

In case A84–401, Audubon's Motion for Preliminary Injunction is DENIED.

In case A84–402, Audubon's Motion for Preliminary Injunction is GRANTED.

---

77. The Secretary acknowledged in his Public Interest Determination that "[w]hile no detailed appraisals were prepared, rough estimates of value suggest that the St. Matthew Island lands may be worth up to $15 million and the land interests conveyed to the United States may be worth up to $9 million."

78. See American Motorcyclist Association v. Watt, 714 F.2d 962, 9655 (9th Cir.1983).

I further ORDER that the $2,500 previously posted by Audubon as a condition of the Temporary Restraining Order shall continue in effect as the bond required for this preliminary injunction.