425 U.S. 662 (1976)
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ET AL.
v.
FEDERAL POWER COMMISSION.
No. 74-1608.
Supreme Court of United States.
Argued February 25, 1976.
Decided May 19, 1976.[*]
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
*663 Howard A. Glickstein argued the cause for petitioners in No. 74-1608 and for respondents in No. 74-1619. With him on the brief were William L. Taylor and Reuben B. Robertson III.
Drexel D. Journey argued the cause for respondent in No. 74-1608 and for petitioner in No. 74-1619. With him on the briefs were Robert W. Perdue and Allan Abbot Tuttle.[]
MR. JUSTICE STEWART delivered the opinion of the Court.
The issue in this case is to what extent, if any, the Federal Power Commission, in the performance of its functions under the Federal Power Act, 41 Stat. 1063, as amended, 16 U. S. C. § 791a et seq. (Power Act), and the Natural Gas Act, 52 Stat. 821, as amended, 15 U. S. C. § 717 et seq. (Gas Act), has authority to prohibit discriminatory employment practices on the part of its regulatees.

*664 I
In 1972 the National Association for the Advancement of Colored People (NAACP) and several other organizations petitioned the Commission to issue a rule "requiring equal employment opportunity and nondiscrimination in the employment practices of its regulatees." The proposed rule would have required the regulated companies to adopt affirmative action programs to combat discrimination in employment and would have given any person who believed himself to have been subjected to employment discrimination by any such company the right to file a complaint with the Commission.[1]
The Commission refused to adopt the proposed rule, holding that it had no jurisdiction to do so because "the purposes of the Natural Gas and Federal Power Acts are economic regulation of entrepreneurs engaged in resource developments. So considered, we do not find the necessary nexus between those aspects of our economic regulatory activities and the employment procedures of the utility systems which we regulate, as would justify [adopting petitioners' proposed rule]." 48 F. P. C. 40, 44.
On petition for review, the Court of Appeals for the District of Columbia Circuit agreed that the Commission was without "power . . . to prescribe personnel practices in detail and to receive complaints, adjudicate them, and punish directly infractions of those practices." 172 U. S. App. D. C. 32, 35, 520 F. 2d 432, 435. The court held, however, that the Commission does have "power to take *665 into account, in the performance of its regulatory functions, including licensing and rate review, evidence that the regulatee is a demonstrated discriminator in its employment relations." Ibid.
Because of doubt as to the Commission's recognition of any power on its part to take into account the employment practices of its regulatees even in the narrower sense described above, the Court of Appeals vacated the Commission's order and remanded the case. Id., at 47, 520 F. 2d, at 447. The Commission and the NAACP each petitioned for certiorari, and we granted both petitions in order to consider the scope of the Commission's authority to deal with discriminatory employment practices on the part of the companies that it regulates. 423 U. S. 890.

II
The question presented is not whether the elimination of discrimination from our society is an important national goal. It clearly is. The question is not whether Congress could authorize the Federal Power Commission to combat such discrimination. It clearly could. The question is simply whether or to what extent Congress did grant the Commission such authority. Two possible statutory bases have been advanced to justify the conclusion that the Commission can or must concern itself with discriminatory employment practices on the part of the companies it regulates.[2]
*666 The first of these statutory bases is the legislative command to the Commission under the Power and Gas Acts to establish "just and reasonable" rates for the transmission and sale of electric energy, 16 U. S. C. § 824d (a), and for the transportation and sale of natural gas, 15 U. S. C. § 717c (a), and, consequently, to allow only such rates as will prevent consumers from being charged any unnecessary or illegal costs.[3] The second and broader statutory basis advanced for Commission regulation of employment discrimination is the Commission's asserted duty to advance the public interest. The NAACP notes that Congress found that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," 16 U. S. C. § 824 (a), and that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest," 15 U. S. C. § 717 (a). From these and other references to the "public interest" in the Gas and Power Acts,[4] it is argued that the Commission is charged with advancing the public interest in general, and that the Commission is thus authorized if not required to promulgate rules prohibiting its regulatees from engaging in discriminatory employment practices, since ending discrimination in employment is in the public interest.

A
The Court of Appeals basically accepted the first of these statutory arguments:
"The Commission's task in protecting the consumer *667 against exploitation can be alternatively described as the task of seeing that no unnecessary or illegitimate costs are passed along to that consumer. Costs incurred by reason of a regulatee's choosing to practice racial discrimination are within the reach of that responsibility. Without attempting an exhaustive enumeration of such costs, we identify at least the following as indicative of those arguably within the Commission's range of concern: (1) duplicative labor costs incurred in the form of back pay recoveries by employees who have proven that they were discriminatorily denied employment or advancement, (2) the costs of losing valuable government contracts terminated because of employment discrimination, (3) the costs of legal proceedings in either of these two categories, (4) the costs of strikes, demonstrations, and boycotts aimed against regulatees because of employment discrimination, (5) excessive labor costs incurred because of the elimination from the prospective labor force of those who are discriminated against, and (6) the costs of inefficiency among minority employees demoralized by discriminatory barriers to their fair treatment or promotion.
"Obviously such costs of employment discrimination range from the very definite and easily ascertainable to the very questionable and virtually unquantifiable. The problem of how to see that they are not borne by the consumer could arise in any number of different regulatory contexts, including both rate and certificate proceedings. We therefore do not attempt to detail all the various ways the Commission may thus `regulate' employment discrimination, leaving this in the first instance to the Commission itself." 172 U. S. App. D. C., at 44, 520 F. 2d, at 444 (footnote omitted).
*668 Without necessarily endorsing the specific identification of the costs "arguably within" the Commission's "range of concern," we agree with the basic conclusion of the Court of Appeals on this branch of the case. The Commission clearly has the duty to prevent its regulatees from charging rates based upon illegal, duplicative, or unnecessary labor costs. To the extent that such costs are demonstrably the product of a regulatee's discriminatory employment practices, the Commission should disallow them. For example, when a company complies with a backpay award resulting from a finding of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e et seq., it pays twice for work that was performed only once. The amount of the backpay award, therefore, can and should be disallowed as an unnecessary cost in a ratemaking proceeding.
To the extent that these and other similar costs, such as attorneys' fees, can be or have been demonstrably quantified by judicial decree or the final action of an administrative agency charged with consideration of such matters, the Commission clearly should treat these costs as it treats any other illegal, unnecessary, or duplicative costs. We were told by counsel during oral argument that the Commission would routinely disallow the costs of a backpay award resulting from an order of the National Labor Relations Board or the decree of a court based upon a finding of an unfair labor practice. The governing principle is no different in the area of discriminatory employment practices.
As a general proposition it is clear that the Commission has the discretion to decide whether to approach these problems through the process of rulemaking, individual adjudication, or a combination of the two procedures. SEC v. Chenery Corp., 332 U. S. 194, 202-203. The present Commission practice, we are told, is to consider *669 such questions only in individual ratemaking proceedings, under its detailed accounting procedures. Assuming that the Commission continues that practice, it has ample authority to consider whatever evidence and make whatever inquiries are necessary to determine whether a regulatee has incurred unnecessary or illegitimate costs because of racially discriminatory employment practices. 15 U. S. C. §§ 717c (e), 717m; 16 U. S. C. §§ 824d (e), 824f.

B
The Court of Appeals rejected the broader argument based upon the statutory criterion of "public interest," and we hold that it was correct in doing so. This Court's cases have consistently held that the use of the words "public interest" in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation.
For example, in the case of the Interstate Commerce Commission, which is responsible for enforcing an Act "designed . . . to assure adequacy in transportation service," "the term `public interest' . . . is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities . . . ." New York Central Securities Corp. v. United States, 287 U. S. 12, 24-25. See also New Haven Inclusion Cases, 399 U. S. 392, 432; National Broadcasting Co. v. United States, 319 U. S. 190, 216; Federal Radio Comm'n v. Nelson Bros. Co., 289 U. S. 266, 285.
Thus, in order to give content and meaning to the words "public interest" as used in the Power and Gas Acts, it is necessary to look to the purposes for which the Acts were adopted. In the case of the Power and Gas Acts it is clear that the principal purpose of those *670 Acts was to encourage the orderly development of plentiful supplies of electricity and natural gas at reasonable prices.[5] While there are undoubtedly other subsidiary purposes contained in these Acts,[6] the parties point to nothing in the Acts or their legislative histories to indicate that the elimination of employment discrimination was one of the purposes that Congress had in mind when it enacted this legislation. The use of the words "public interest" in the Gas and Power Acts is not a directive to the Commission to seek to eradicate discrimination, but, rather, is a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates.[7]
*671 It is useful again to draw on the analogy of federal labor law. No less than in the federal legislation defining the national interest in ending employment discrimination, Congress in its earlier labor legislation unmistakably defined the national interest in free collective bargaining. Yet it could hardly be supposed that in directing the Federal Power Commission to be guided by the "public interest," Congress thereby instructed it to take original jurisdiction over the processing of charges of unfair labor practices on the part of its regulatees.
We agree, in short, with the Court of Appeals that the Federal Power Commission is authorized to consider the consequences of discriminatory employment practices on the part of its regulatees only insofar as such consequences are directly related to the Commission's establishment of just and reasonable rates in the public interest. Accordingly, we affirm the judgment before us.
It is so ordered.
MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.
MR. JUSTICE POWELL, concurring.
Although I join in the opinion of the Court, I write briefly to emphasize a point that seems important.
The Court quotes a portion of the opinion of the Court of Appeals that identifies six categories of "costs" said to be "arguably within the Commission's range of concern." Ante, at 667. The Court of Appeals correctly noted, however, that these costs "range from the very definite and easily ascertainable to the very questionable and virtually unquantifiable." Ibid.
*672 The Court's opinion explicitly does not endorse all of these categories of costs, and requires that consideration be given only to costs that have been "demonstrably quantified by judicial decree or the final action of an administrative agency charged with consideration of such matters . . . ." Ante, at 668. Although implicit in what the Court says, I think it important to emphasize that the costs identified in the opinion of the Court of Appeals as categories (4), (5), and (6) could not be quantified without resort to wholly speculative assumptions that would be unacceptable for ratemaking purposes. It would be quite impossible, for example, to measure or determine with any exactitude "the costs of inefficiency among minority employees demoralized by discriminatory barriers to their fair treatment or promotion." Nor is it likely that "the costs of strikes, demonstrations, and boycotts aimed against [a utility] because of employment discrimination," ante, at 667, could ever be determined with sufficient reliability.
In view of the inherently amorphous nature of these categories of costs, it would not be in the public interest to allow intervenors to delay the orderly progress of rate proceedings in the vain hope that such costs might, after protracted litigation, be quantified. I do not read the Court's opinion as requiring any such encumbering of the Commission's prescribed statutory authority and discretion.
MR. CHIEF JUSTICE BURGER, concurring in the judgment.
I join the judgment of the Court even though I find it difficult to understand why the result reached by the Commission was not a reasonable administrative determination. The Court of Appeals read the Commission's order in this case as "ambiguous":
"We do not know whether its order asserted a lack *673 of jurisdiction to adopt (1) the specific proposed rule, or (2) any rule relating to employment discrimination by regulatees." 172 U. S. App. D. C. 32, 34, 520 F. 2d 432, 434 (emphasis in original).
In context, the FPC's order could fairly have been read simply as rejecting the rule proposed by the NAACP. This is particularly true in view of the Commission's auditing practice of disallowing duplicative costs, including those occasioned by backpay awards. Ante, at 668.
In contrast to this standard administrative practice, the rule proposed to the Commission called for extensive regulation of the employment practices of industries subject to FPC jurisdiction. Under the proposed rule, the Commission would, among other things, be required to: (a) enumerate unlawful employment practices; (b) require regulatees to establish a written program for equal employment opportunity which would be filed with the Commission; and (c) provide for individual employees to file discrimination complaints directly with the Commission.
The Court of Appeals correctly recognized that this far-reaching proposal would put the Federal Power Commission into the business of regulating the everyday employment practices of regulated industries. The necessary result of this intrusion would be the imposition of another layer of federal regulation of the same subject matter, with the inevitable potential for conflict between administrative agencies.[*] If Congress had *674 mandated duplicative regulation, the result, however inefficient, would be none of our concern. But Congress did not do so. It centralized responsibility in the Equal Employment Opportunity Commission. To the extent that the judiciary orders administrative responsibility to be diffused, congressional intent is frustrated, regulated industries are subjected to the commands of different voices in the bureaucracy, and the agonizingly long administrative process grinds even more slowly. To suggest, for example, that the FPC could deny a license on account of a regulatee's discriminatory employment practices, 172 U. S. App. D. C., at 44, 520 F. 2d, at 444, is to thrust the Commission into a complex, volatile area for which Congress has already assigned authority to the EEOC.
No reason whatever exists to assume that Congress intended to enmesh the FPC so deeply in the regulation of employment practices. The Commission was thus confronted with a duplicative and unprecedented proposal; it could appropriately refuse to adopt the rule as beyond its jurisdiction; since the Court of Appeals concluded that the FPC was correct in this respect, the Commission's order could appropriately have been affirmed.
NOTES
[*] Together with No. 74-1619, Federal Power Commission v. National Association for the Advancement of Colored People et al., also on certiorari to the same court.
[] Solicitor General Bork, Assistant Attorney General Pottinger, and Abner W. Sibal filed a memorandum for the United States et al. as amici curiae urging affirmance in both cases.

Briefs of amici curiae were filed in both cases by Jerome J. McGrath and Melvin Richter for the Interstate Natural Gas Association of America; by Cameron F. MacRae, Charles P. Sifton, and John A. Rudy for the Edison Electric Institute; and by the National Black Media Coalition et al.
[1] Under the proposed rule, a complaint that indicated a probable violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e et seq., could be referred by the Commission to the Equal Employment Opportunity Commission. The proposed rule is reproduced in full as an appendix to the opinion of the Court of Appeals in this case. See 172 U. S. App. D. C. 32, 48, 520 F. 2d 432, 448.
[2] We deal here only with questions of statutory interpretation. In the Court of Appeals and in its cross-petition for certiorari the NAACP argued that the Commission has a duty under the Fifth Amendment to prevent employment discrimination by its regulatees. In its briefs on the merits, however, the NAACP notes that a decision on this constitutional question is unnecessary if we hold, as we do, that the Commission has statutory authority to consider the consequences of employment discrimination in performing its mandated regulatory functions.
[3] See, e. g., Acker v. United States, 298 U. S. 426, 430-431; Cities Serv. Gas Co. v. FPC, 424 F. 2d 411 (CA10); Safe Harbor Water Power Corp. v. FPC, 179 F. 2d 179 (CA3). See also n. 5, infra.
[4] See, e. g., 15 U. S. C. §§ 717b, 717f (a), 717n; 16 U. S. C. §§ 797 (e), (g), 800 (a), 803 (i), 806, 815, 824a (a-c), (e), 824b (a-b), 824c (a). See also 15 U. S. C. §§ 717f (b-c), (e).
[5] 16 U. S. C. § 824a (a) (The purpose of the Power Act is to "assur[e] an abundant supply of electric energy throughout the United States with the greatest possible economy"); Pennsylvania Power Co. v. FPC, 343 U. S. 414, 418 ("A major purpose of the [Power] Act is to protect power consumers against excessive prices"); FPC v. Hope Gas Co., 320 U. S. 591, 610 (The "primary aim" of the Natural Gas Act is "to protect consumers against exploitation at the hands of natural gas companies"). See also S. Rep. No. 621, 74th Cong., 1st Sess., 17; FPC v. Tennessee Gas Co., 371 U. S. 145, 154; Atlantic Rfg. Co. v. Public Serv. Comm'n, 360 U. S. 378, 388; Permian Basin Area Rate Cases, 390 U. S. 747, 770.
[6] For example, the Commission has authority to consider conservation, environmental, and antitrust questions. See 15 U. S. C. § 717s (a); 16 U. S. C. §§ 803 (a), (h); Gulf States Utilities Co. v. FPC, 411 U. S. 747; Udall v. FPC, 387 U. S. 428.
[7] The Federal Communications Commission has adopted regulations dealing with the employment practices of its regulatees. See 47 CFR §§ 73.125, 73.301, 73.599, 73.680, 73.793 (1975). These regulations can be justified as necessary to enable the FCC to satisfy its obligation under the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 et seq., to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups. See Office of Communication of United Church of Christ v. FCC, 123 U. S. App. D. C. 328, 359 F. 2d 994; 33 Fed. Reg. 9960, 9962. It has nowhere been argued that the Federal Power Commission needs similar regulations in order to promote energy production at reasonable rates.
[*] A former Assistant Secretary of the Treasury has observed:

"The proliferation of government controls has, perhaps inevitably, led to internal conflicts. In some cases, the rules of a given agency work at cross-purposes with each other. . . . More serious and more frequent are the contradictions between the rulings of two or more government agencies where the regulated have little recourse." Weidenbaum, The New Wave of Government Regulation of Business, 15 Business and Society Review 81, 84 (1975).
See also U. S. News & World Report, May 10, 1976, p. 96. And as Mr. Justice Douglas reminded us:
"The bureaucracy of modern government is not only slow, lumbering, and oppressive; it is omnipresent." Wyman v. James, 400 U. S. 309, 335 (1971) (dissenting opinion).