UNITED STATES of America, Plaintiff,

v.

COLUMBIA ARTISTS MANAGEMENT, INC., et al., Defendants.

No. 104–165 (WCC).

United States District Court, S.D. New York.

June 16, 1987.

Ralph T. Giordano, Chief, Antitrust Div., U.S. Dept. of Justice, New York City, for plaintiff; Robert Einstein, Antitrust Div., of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendants; Seymour D. Lewis, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Columbia Artists Management Inc. ("Columbia"), and Community Concerts Inc. ("Community") have moved this Court to terminate the Final Judgment entered in this action on October 20, 1955. The United States has consented to the entry of an order terminating the Final Judgment and has submitted a legal memorandum in support of that result. For the reasons outlined below, the motion is granted.

*Background*

On October 20, 1955, the United States filed in this Court a civil complaint against Columbia, its subsidiary Community, National Concert and Artists Corporation, and its subsidiary Civic Concert Service, Incorporated. Columbia and National were managers of concert artists and their subsidiaries were engaged in the organization and maintenance of audience associations. The complaint charged the defendants with conspiracy to restrain and monopolize trade in the management and booking of concert artists and in the formation and maintenance of organized audience associations in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The complaint alleged that the conspiracy began in or about 1933 and continued up to the date of the filing of the complaint.

As a result of the foregoing activities, the complaint charged that competition in the management and booking of artists and in the maintenance of organized audience associations was suppressed; artists were compelled to subject themselves to the management and control of the defendants in order to obtain adequate bookings; organized audience associations were deprived of access to artists not controlled by defendants; and independent concert services were excluded from the concert service business and were subject to the domination and control of Columbia and National.

The Final Judgment was entered into on October 20, 1955. Section IV of the Final Judgment contains traditional injunctions against illegal conduct, barring defendants from agreeing to allocate or divide territories or markets or otherwise refrain from competing in the organization or maintenance of audience associations, or agreeing to exclude any person from engaging in the organization or maintenance of audience associations. Section V of the Final Judgment imposes various affirmative duties upon defendant Community, and Section IV enjoins defendants from a variety of anticompetitive activities.

The government has consented to termination of this Final Judgment because it believes that continuation of the Final Judgment no longer serves the public interest in "free and unfettered competition." *Northern Pacific Railroad v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). According to the government, the Final Judgment's prohibitions regarding the organization and maintenance of audience associations and the affirmative requirements imposed upon the defendants are no longer necessary in view of the current state of the concert industry, and may actually inhibit rather than promote competition.

In addition, maintaining the judgment in perpetuity, as it is currently written, would not be consistent with the current Department of Justice Antitrust Division policy of limiting consent judgments to a period of

ten years, even in the case of per se violations of the Sherman Act. In 1955, the year of entry of the Final Judgment, the maximum penalty for violation of the Sherman Act by a corporation was a $50,000 fine. At that time, the Antitrust Division sought perpetual decrees so that, in the event of subsequent violations, more substantial penalties could be levied through criminal contempt proceedings. In 1974, however, when Sherman Act violations were made felony offenses, the maximum fine which could be levied against a corporation was increased to $1,000,000. *See* 15 U.S.C. §§ 1–3. Because of this change, and for other reasons, the Antitrust Division adopted a policy several years ago of generally limiting consent judgments to a term of ten years. According to the government, termination of the Final Judgment at this time would be consistent with that policy.

The government believes that the substantial changes that have taken place in the presentation of concert artists since 1955, the year the decree was entered, justify termination of the Final Judgment. At the time the complaint was filed, Columbia and National were the two largest managers of performing artists in the country, managing or representing, according to the complaint, artists whose bookings accounted for more than 80% of all artists' bookings in the United States. In addition, both Columbia and National, through their respective subsidiaries, Community and Civic, conducted concert service businesses engaged in forming and maintaining organized audience associations throughout the United States. According to the complaint, Columbia had more than 800 organized audience associations and National had more than 400. Both Columbia and National followed a similar pattern in organizing and maintaining audience associations. Each entered into contracts with its audience associations whereby it was made exclusive agent to engage all artists performing before such associations.

The complaint against the defendants stated that there were three outlets for concert artists at the time the decree was entered: local impresarios, educational institutions, and "most important of all, organized audience associations." The complaint asserted that "the majority of bookings are made with organized audience associations." According to the government and defendants, in the 30 years since entry of the decree, the audience association has become an increasingly less significant presenter of concert artists.

A number of factors have contributed to the audience association's diminishing segment of the market. The greatest change in the market has been the dramatic increase in the number of presenting organizations. Colleges and universities, which were acknowledged in the complaint as one of three primary groups of presenters of concert artists, have grown in prominence and constitute the single largest segment of the market for presentation of concert artists.

Since entry of the Final Judgment, there has also been a proliferation in the number of civic organizations presenting concert artists. In large part, this is attributable to subsidization of arts programs by federal, state and local governments. In 1956, one year after the Final Judgment was entered, Congress created the National Foundation on the Arts and Humanities, an independent agency of the Executive Branch of the federal government. The Foundation is composed of the National Endowment for the Arts, the National Endowment for the Humanities and a coordinating council on the Arts and Humanities. The National Endowment for the Arts supports dance programs, musical performances, and other cultural events by providing direct grants to performing artists, music centers, choruses, symphony orchestras and local art councils. Appropriations to the NEA for fiscal year 1984 were over $160 million.

In addition to federal funding of arts programs, there are arts councils in practically every state in the United States. At the time the decree was entered, state and local arts councils were virtually non-existent. In 1981–82, in New York alone, the State Council on the Arts spent over $32 million on its local assistance program to

support a wide variety of the arts in New York. Through its Music Program, the Council helps support orchestras, opera companies, choral societies, and numerous other musical performers and presenters of musical performances. The Council's Dance Program and Theatre Program help support dance companies and theatre groups throughout the state. The Council's Presenting Organizations Program is dedicated to supporting a wide range of organizations committed to the presentation of quality performing arts programs in their communities.

The result of this massive increase in federal and local assistance of art programs since entry of the Final Judgment has been a dramatic increase in the number of local organizations sponsoring concert performances. When the decree was entered, in many communities the only organization which presented concert performances was the local audience association. Today, in large part the audience association has been supplanted by one or more presenters, many of which receive subsidization from governmental sources. In addition, many local presenters of concert performances are supported by local citizens as well as local businesses.

Orchestras have also become an increasingly important presenter of concert artists. According to the Chief Executive Officer of the American Symphony Orchestra League, there are approximately 1,500 orchestras in the country, approximately 600 of which are college orchestras.

The Government believes that in today's market, the affirmative provisions in Section V and the restrictions in Section VI of the Final Judgment require Community to provide independent managers with access to an increasingly insignificant segment of the market for concert artists, namely Community's audience associations. At the time the Final Judgment was entered, to maintain a successful career it was imperative for all but the most well known artists to obtain bookings with the audience associations. Today, audience associations are no longer an integral part of most performers' schedules. Independent managers indicated to the government that they no longer need to rely upon bookings from the audience associations. Many of these managers are among the most successful agents in the business; they are able to develop successful careers for their clients without obtaining bookings from the audience associations, which was significantly more difficult, if not impossible, 30 years ago when the Final Judgment was entered.

The nature of the industry has changed dramatically since the Final Judgment was entered. Today, access to Community's audience associations is not critical for independent managers. This is very different from the situation that existed when the Final Judgment was entered. At that time, Columbia, through its control of Community and through its anticompetitive arrangement with National and Civic, was able to maintain its then highly attractive audience associations as an almost exclusive source of bookings for its roster of clients. This enhanced Columbia's power as a manager of concert artists and hampered the efforts of independent managers to compete with Columbia for clients.

Today, according to the government, there appears to be healthy competition between Columbia and competing managers. Columbia is, by most accounts, the largest manager of artists. It has, however, a number of significant competitors. Further, it is relatively easy and inexpensive to start an agency; all one really needs is some expertise and a number of marketable clients. More importantly, Columbia's continued significance as an agent is no longer related to its control of Community and the bookings it is able to derive from its audience associations. Although Community continues to provide a source of bookings for Columbia's artists, it is no longer the indispensable segment of the market which it was at the time the Final Judgment was entered. According to figures provided to the government by its counsel, for the concert season 1981–82, just over 12% of the earnings of Columbia's own managed artists and attractions were generated from Community's audience associations. Thus, even for Columbia, the

audience association appears to be an increasingly less significant source of bookings.

Terminating the Final Judgment may also have pro-competitive effects, according to the government. Some of the larger independent managers may be interested in organizing audience associations of their own if they no longer have court-ordered access to Community's audience associations. Although it is uncertain whether many managers will do so in view of the fact that relatively few avail themselves of the opportunity to book with the audience associations, it is virtually certain that none will do so as long as the Final Judgment provides them with access to Community's audience associations. Further, even absent the decree, independent managers may still be able to obtain bookings in Community's associations. As long as Community's audience associations have the option of disassociating themselves from Community and pursuing local, state and federal grants, Columbia and Community will have to continue to be responsive to their associations' needs, especially as they become more sophisticated and experienced. If Community is unable to provide its audience associations with an appropriate caliber of artist represented by Columbia, it will have to seek artists managed by others or run the risk of having its audience associations go "independent."

For all of these reasons, the government believes that termination of the Final Judgment is in the public interest. The prohibitions against territorial allocation in the Final Judgment bar conduct which is per se illegal and are, therefore, merely duplicative of existing law. According to the government, the various prohibitions in the Final Judgment concerning the organization and maintenance of audience associations and affirmative duties imposed upon defendants are no longer necessary in view of the current state of the concert industry. Maintaining the Final Judgment, which is already thirty-years old, in perpetuity may actually inhibit rather than promote competition. Hence, according to the government, termination of the Final Judgment at this time is in the public interest.

## Discussion

This Court has jurisdiction to modify or terminate the Final Judgment pursuant to Section IX of the Final Judgment Rules 60(b)(5) and (6), Fed.R.Civ.P., and "principles inherent in the jurisdiction of the chancery." *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

■ Where, as here, the United States consents to the proposed termination of the final judgment in a government antitrust case, the issue before the Court is whether termination of the judgment is "in the public interest." *United States v. Swift & Co.*, 1975–1 Trade Cas. ¶ 60,201, at 65,702 (N.D. Ill.1975); *see also United States v. General Motors Corp.*, 1983–2 Trade Cas. ¶ 65,-614 (N.D.Ill. Aug. 15, 1983) [Available on WESTLAW, DCT database] *United States v. General Electric Co.*, 1977–2 Trade Cas. ¶ 61,659, at 72,717 (E.D.Pa.1977). This is the same standard that a district court applies in deciding whether to enter an initial consent decree submitted by the government in an antitrust proceeding. *See* 15 U.S.C. § 16(e); *United States v. AT & T*, 552 F.Supp. 131, 147 v. 67 (D.D.C. 1982), *aff'd sub nom.*, *Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *United States v. Radio Corp. of America*, 46 F.Supp. 654, 656 (D.Del.1942), *appeal dismissed*, 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161 (1943).

The Supreme Court has held that where the words "public interest" appear in federal statutes designed to regulate public sector behavior, they "take meaning from the purposes of the regulatory legislation." *NAACP v. FPC*, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976); *see also System Federation No. 91 v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961); *United States v. American Cyanamid Co.*, 719 F.2d 558 at 565 (2nd Cir. 1983). In this case, the Sherman Act is the underlying statute, and "the policy unequivocally laid down by [that] Act is competition." *Northern Pacific Railway v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).

Thus, the ultimate question before the Court is whether termination of the Final Judgment would serve the public interest in "free and unfettered competition as the rule of trade." *Northern Pacific Railway v. United States, supra,* 356 U.S. at 4, 78 S.Ct. at 517.

 In answering this question, the Court recognizes that the Department of Justice has broad discretion in controlling government antitrust litigation. *See Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 689, 81 S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961). In *United States v. Mid-America Dairymen, Inc.,* 1977–1 Trade Cas. ¶ 61,508, at 71,980 (W.D.Mo.1977), the court summarized the judiciary's role in determining whether the initial entry of a consent judgment is "in the public interest":

> Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should ... carefully consider the explanations of the government ... and its responses to comments in order to determine whether those explanations are reasonable under the circumstances ....
>
> This Court may not substitute its opinion or views concerning the prosecution of alleged violations of the antitrust laws or the determination of appropriate injunctive relief for the settlement of such cases absent proof of an abuse of discretion.

It seems appropriate for the Court to exercise a similar role when the government consents to the termination of a judgment. *United States v. Swift & Co., supra,* 1975–1 Trade Cas. at 65,702–03.

 In the case at bar, the Department of Justice has offered a reasonable and persuasive explanation of why the termination of the judgment would serve the public interest in free and unfettered competition. The Justice Department has also provided convincing responses to the small number of comments received by the Court opposing the termination. In view of the changed environment in which the Final Judgment now operates, there is no persuasive reason for maintaining it and imposing upon the defendants a decree which no longer comports with the current state of the market.

### Conclusion

For the reasons outlined above, the motion to terminate the Final Judgment is granted.

So ordered.