The PROCESS GAS CONSUMERS GROUP, the American Iron and Steel Institute and the Georgia Industrial Group, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

The Public Utilities Commission of the State of California, Interstate Natural Gas Association of America, the National Association of Regulatory Utility Commissioners, the Association of Business Advocating Tariff Equity, American Gas Association, Gas Research Institute, and Office of the Consumers' Counsel, State of Ohio, Intervenors.

No. 89–1739.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1991.

Decided April 19, 1991.

William H. Penniman, for petitioners, The Process Gas Consumers Group, The American Iron and Steel Institute, and The Georgia Industrial Group, and intervenor, The Ass'n of Businesses Advocating Tariff Equity.

Samuel Soopper, Attorney, F.E.R.C., with whom William S. Scherman, General Counsel, F.E.R.C., and Joseph S. Davies, Deputy Sol., F.E.R.C., were on the brief for respondent. Joel M. Cockrell and Jerome M. Feit, Attorneys, F.E.R.C., also entered appearances for respondent.

James M. Broadstone, with whom Peter C. Lesch and Steven M. Kramer, for Gas Research Institute, John H. Cheatham, III, and Jean E. Sonneman, for Interstate Natural Gas Ass'n of America, James T. Quinn, for The Public Utilities Com'n of the State of Cal., David J. Muchow and Eric N. Wise, for American Gas Ass'n, and Paul Rodgers and Charles D. Gray, for The Nat. Ass'n of Regulatory Utility Com'rs, were on the joint brief, for intervenors.

Janice E. Kerr also entered an appearance for intervenor The Public Utilities Com'n of the State of Cal.

William A. Spratley, Margaret Ann Samuels and Joseph P. Serio were on the brief for intervenor Office of the Consumers' Counsel, State of Ohio.

Before WALD, RUTH BADER GINSBURG and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioners seek review of decisions issued by the Federal Energy Regulatory Commission ("FERC" or "Commission") on remand from this court's decision in *Process Gas Consumers Group v. FERC,* 866 F.2d 470 (D.C.Cir.1989) ("PGC I"). At issue is FERC's approval of a natural gas rate surcharge to support "end-use" research by the Gas Research Institute

("GRI"). Upon a thorough review of the extensive record, we find aspects of the Commission's order inconsistent with FERC regulations and the standards set forth by this court in *PGC I.* Accordingly, we grant the petition for review, affirm in part and vacate in part the order on remand.

## I. BACKGROUND

GRI is a collaborative research organization of the natural gas industry which performs extensive research, development and demonstration ("RD & D") activities. These projects are currently "financ[ed] more or less exclusively via direct FERC-approved surcharges on jurisdictional throughput, *i.e.,* gas supplies delivered through regulated pipelines to consumers." *PGC I,* 866 F.2d at 471. In 1988, the Process Gas Consumers Group challenged FERC's approval of a surcharge of 1.51 cents per Mcf[1] to support GRI's 1988 budget.[2] In particular, the Group challenged FERC's approval of surcharges to underwrite "end-use" RD & D aimed at developing more efficient gas appliances and applications and new consumer uses for gas.

In *PGC I,* this court granted the Group's petition and remanded to the agency for further proceedings. In doing so, we first distinguished GRI's research in past years which had as its "broad goal the conservation of dwindling gas supplies." *Public Utilities Commission of Colorado v. FERC,* 660 F.2d 821, 825 (D.C.Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982). In contrast, we observed, end-use research was "aimed [in part] at generating *new* demand for natural gas" and thus was likely to increase the demand for and the price of gas. *PGC I,* 866 F.2d at 474 (emphasis in original). Accordingly, such research was less likely to have "a reasonable chance of benefitting

the rate-payer in a reasonable period of time," as required by FERC regulations. 18 C.F.R. § 154.38(d)(5)(iii)(*d*). We found that FERC's decision that the end-use research projects proposed by GRI met the required standard was inadequately supported.

Our directions to FERC on remand were specific; as they are central to this proceeding, we quote them at length:

> [T]he Commission need not undertake scientific "peer review" or otherwise attempt to determine with precision whether the efficiency gains from an end-use application will outweigh the costs to ratepayers of the research. It is enough for the Commission rationally to conclude that the research contemplated is *by its nature* likely to benefit ratepayers if successful.
>
> . . . .
>
> When determining whether end-item research ... "has a reasonable chance of benefitting the ratepayer in a reasonable period of time," FERC, we think, is required to find that the research, if successful, will on balance work to the benefit of existing classes of ratepayers—those customers paying for the research in the first place. On the benefit side of the equation, FERC may include all economic gains that might inure to existing classes of ratepayers through the employment of gas-saving devices, thus excluding those efficiency gains that flow to consumers who switch to gas by reason of ratepayer-financed research. On the cost side, FERC not only must account for the initial expense of the research but also must make a rational judgment about the probable economic effect of the research, if successful. FERC must at least consider whether a

1. Natural gas is often measured volumetrically in cubic feet (1 Mcf = 1,000 cubic feet; 1 Tcf = 1 trillion cubic feet) or in terms of Btus of heat content (1 Mcf approximately equals 1.03 MMBtu; 1 Tcf approximately equals 1.03 quads of energy).

2. In an earlier case we noted that "the average household consum[es] 125 Mcf during one year

for space heating, cooling and water heating." *Public Utilities Commission of Colorado v. FERC,* 660 F.2d 821, 822 n. 1 (D.C.Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982). Such a consumer would be assessed approximately $1.89 under the proposed 1988 surcharge.

project is intended to create a new market for gas among present consumers of an alternative fuel, and whether that new demand is likely to work to the disadvantage of existing ratepayers by pushing up gas prices.

*PGC I*, 866 F.2d at 474, 476–77 (emphasis in original).

On remand, FERC consolidated the remanded proceedings on GRI's 1988 budget with its review of GRI's 1989 budget. FERC requested and received new submissions from GRI justifying its end-use research proposals in light of *PGC I.* FERC also invited and accepted responses from other participants, but denied a request by certain participants for discovery of background documents supporting GRI's new submissions.

In its order on remand, *Gas Research Institute*, 48 F.E.R.C. ¶ 61,048 (1989), FERC adopted GRI's analysis and approved both GRI's 1988 and 1989 budgets and the attendant surcharges. The Commission found, *inter alia*, that:

- end-use RD & D would increase gas demand by 1.1 Tcf, but that increases in supply resulting from GRI's supply-related research (not at issue in this remand) would offset this increase;
- such increased demand would, taken alone, increase prices by 15 cents per MMBtu;
- increased demand would also reduce per-unit transmission and distribution costs by 8.3 cents per MMBtu (through the more complete use of existing capacity), leaving a net cost increase of 6.7 cents per MMBtu;
- based in part on these findings and on other evidence in the record, the proposed end-use research satisfied the criterion set forth in *PGC I, i.e.*, that the expected benefits of the research exceed the expected costs.

The petitioners, the Process Gas Consumers Group, the American Iron and Steel Institute, and the Georgia Industrial Group (collectively "the Industrial Groups" or "the Groups"), represent industrial consumers of natural gas; they now seek review of FERC's decision on remand.

## II. ANALYSIS

### A. *Procedural Challenges*

The Industrial Groups first raise several challenges to the procedures FERC used on remand and contend that FERC unfairly structured its procedures in favor of GRI. We find these claims unsubstantiated and affirm the Commission's procedures.

 The Industrial Groups first take issue with FERC's denial of the Groups' requests for discovery from GRI of certain information that the Groups sought in preparing their response to GRI's submissions on remand. In assessing this claim, we begin from the premise that FERC "has broad discretion ... to decide what procedures to use in fulfilling its statutory responsibilities." *Kansas Power & Light Co. v. FERC*, 851 F.2d 1479, 1484 (D.C.Cir. 1988). In this case, consistent with its established practice for GRI-budget proceedings, FERC did not hold a hearing, nor does the record suggest that the participants sought a hearing. This fact is significant because the Commission's discovery regulations "appl[y] to discovery in proceedings *set for hearing* ... and to such other proceedings as the Commission may order." 18 C.F.R. § 385.401(a) (emphasis supplied). Therefore, the use of discovery outside of the hearing context lies within the discretion of the Commission. In this case, FERC, noting that the matter was on remand and that the remand standard called for a "common-sense assessment," chose not to grant the Groups' discovery requests. On these facts, we cannot find that FERC's denial constitutes an abuse of discretion.

 The Industrial Groups also challenge FERC's failure to undertake an independent staff evaluation of GRI's analysis and assumptions. FERC found such an analysis was unnecessary because "the Commission staff had already prepared two reports in 1987 and 1988 addressing end-use R & D." *Gas Research Institute*, 49 F.E.R.C. ¶ 61,004 (1989). Moreover, because of its experience reviewing other proposals that used similar methodologies, the

Commission was familiar with the project assessment methodology used by GRI. Again, on these facts, we cannot conclude that FERC's failure to undertake on remand an independent staff analysis constituted an abuse of discretion.

Finally, the Industrial Groups contend that FERC incorrectly shifted the burden of proof to the Groups. This claim is unfounded. Although FERC ultimately adopted most of GRI's conclusions, its decision reflects that FERC weighed and rejected each of the participants' major challenges to GRI's findings. 48 F.E.R.C. ¶ 61,048 at 61,225–36. Accordingly, we reject the Industrial Groups' procedural contentions and turn to their substantive challenges to FERC's order on remand.[3]

### B. *Substantive Challenges*

As noted above, in *PGC I* this court directed FERC to consider on remand whether GRI's proposed research "is *by its nature* likely to benefit [existing class of] ratepayers." *PGC I,* 866 F.2d at 474 (emphasis in original). To do so, FERC must determine whether the research "will on balance work to the benefit of existing classes of ratepayers," *id.* at 476, and make a rough assessment of the various costs and benefits to existing ratepayers of the proposed research. We also noted that in certain cases—such as in weighing "a project that is aimed at creating captive gas demand"—the "Commission would face a heavy burden in justifying ratepayer financing of research." *Id.* at 477.

The petitioners contend that, on remand, FERC failed to comply with this court's directions in several respects; FERC, in turn, defends its actions against this accusation. We first examine the nature of the proposed research, and then consider the petitioners' contentions.

#### 1. GRI's Research Taxonomy

In its order on remand, FERC adopted a taxonomy of research (first set forth by GRI) that distinguishes among three classes of research projects.[4]

*Class–1 technologies* involve improvements in equipment currently used by ratepayers, such as residential and commercial gas appliances and advanced industrial heat transfer systems.

. . . .

*Class–2 technologies* involve new technologies which existing customers may add to their existing equipment. [One] example[ ] of this class of technology [is] residential cooling as an added option for residential customers already using gas for space heating, water heating, clothes drying and/or cooking. . . .

. . . .

*Class–3 technologies* would create new uses for natural gas. The users of these technologies would primarily be customer classes which have not traditionally relied on natural gas, such as vehicular transportation customers.

48 F.E.R.C. at 61,222–23. The Commission approved all three of these classes of research. Below, we first address two arguments raised by the parties that concern all three classes. Thereafter, we consider each class in turn to determine "that the

---

3. FERC also challenges the intervention in this matter of the National Association of Regulatory Utility Commissioners ("NARUC"), which argues in support of FERC's order. The Commission contends that 15 U.S.C. § 717r bars intervention except by parties to the original proceeding. That section provides that "[a]ny party . . . aggrieved by an order . . . may obtain [ ] review . . . in the court of appeals." We note that, upon first reading, this section appears to govern only who may petition for review, not who may intervene in a review proceeding. *Cf. Process Gas Consumers Group v. FERC,* 912 F.2d 511 (D.C.Cir.1990). However, as all of the arguments presented by the intervenors were ade-

quately addressed by the petitioners and the Commission, NARUC's intervention in this case is largely academic. Accordingly, we need not and therefore do not resolve this question at this time.

4. The Industrial Groups take issue with FERC's adoption of this taxonomy. However, they fail to indicate why they believe FERC's decision to be unreasonable or improper and also fail to offer any alternative classification scheme. As we noted in *PGC I,* "FERC is entitled to substantial deference in its . . . classification of these projects." 866 F.2d at 477.

Commission's decisionmaking is reasoned, principled, and based upon the record." *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C.Cir.1979).

2. General Arguments

a. *Effects on Demand and Prices*

■ Reiterating an argument first raised in *PGC I*, the Industrial Groups contend that because end-use research will increase demand for gas (and therefore drive up gas prices) such research is categorically inconsistent with FERC's authority under the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, and FERC regulations. In support of their argument, the Groups cite FERC's findings that the contested RD & D will increase gas demand by 1.1 Tcf. 48 F.E.R.C. at 61,224. This argument, however, is misguided. Both the terms of the Commission's regulations and our decision in *PGC I* (interpreting the NGA and FERC regulations) expressly indicate that the relevant analytical touchstone for evaluating end-use research is not gas *demand* or gas *prices*, but rather *benefits* to existing classes of ratepayers. *See* 18 C.F.R. § 154.38(d)(5)(iii)(*d*); *PGC I*, 866 F.2d at 475–76.

The claims of the petitioners notwithstanding, research that increases demand may, in fact, benefit existing classes of ratepayers. For example, research that enhances the efficiency of existing appliances benefits current ratepayers even if such research also increases demand (*e.g.*, by encouraging the purchase of the improved appliances), so long as the efficiency gains offset the costs (to existing ratepayers) of increased demand. As this court concluded in *PGC I*, the relevant mode of evaluation is not a categorical assessment that bars all research that increases demand, but rather a more discriminating "net-benefits" analysis. Accordingly, we reject the petitioners' suggestion that the Commission's order should be vacated *in toto* because end-use research increases gas demand and prices.

b. *Aggregation of Supply Research and End–Use Research*

■ FERC also offers a broad argument in support of its order. Noting that, in addition to its end-use research (the focus of this case), GRI also conducts research designed to enhance the *supply* of natural gas, FERC contends that the two research programs should be aggregated. More precisely, the Commission maintains that any increase in demand resulting from GRI's end-use research is more than offset by GRI's supply research. In the terms of *PGC I*, FERC suggests that even if end-use research taken alone does not "on balance work to the benefit of existing classes of ratepayers," any negative demand effect of end-use research will be more than offset by GRI's other good works.

Such aggregation is both inconsistent with this court's directions on remand and analytically unsound. First, the record suggests that both GRI and FERC treat GRI's supply research and its end-use research as two separate programs. Building on this practice, the petitioners in *PGC I* and the *PGC I* court addressed only end-use research. Accordingly, our remand to the Commission was limited to such research.

Moreover, as a logical matter, the Commission's argument compares apples on the one hand with apples and oranges on the other. A cost-benefit analysis should compare the costs and benefits of the *same* proposal; FERC suggests that the costs of GRI's end-use research should be weighed against the benefits of *both* GRI's end-use *and* its supply research. Thus, even if it were appropriate for FERC to aggregate the benefits of GRI's end-use and supply research programs, FERC would also be required to aggregate the *costs* of those programs. For these reasons, we reject FERC's aggregation of GRI's supply and end-use research programs as unreasonable and erroneous.

3. Specific Class–Related Arguments

a. *Class–1 Research*

■ In approving Class–1 research, FERC embraced GRI's assessment that the benefits from this class of RD & D would accrue *exclusively* to current classes of

ratepayers and concluded that therefore the research would by its nature benefit those ratepayers. FERC also accepted GRI's contention that the research would generate very little new demand (0.09 Tcf) and would yield very substantial consumer savings ($2.437 billion). 48 F.E.R.C. at 61,236. On these grounds, the Commission concluded that Class–1 research met the net-benefits test set forth in *PGC I.*

The Commission's conclusions are well supported in the record and reflect its consideration of the relevant issues, as set forth in *PGC I.* The Industrial Groups' primary challenge to this class of research is that such research will increase both the demand for gas and gas prices and therefore is not "by its nature" likely to benefit current ratepayers. As demonstrated above, however, this argument fails. Accordingly, on the record before us, we find that the Commission's approval of Class–1 research was supported by substantial evidence, consistent with *PGC I,* and not arbitrary and capricious.[5]

### b. Class–2 Research

■ Class–2 research differs from Class–1 research in that Class–2 research "would, to a greater extent than class–1 technologies, also benefit users of the new technology *who would otherwise not have used natural gas at all.*" 48 F.E.R.C. at 61,238 (emphasis supplied). In assessing Class–2 research, FERC first determined that this difference does not "render the R & D projects 'by [their] nature' unbeneficial [sic] to existing classes of ratepayers."

48 F.E.R.C. at 61,226. In this regard, we agree with the Commission.

By definition, Class–2 technologies are targeted at current gas consumers, creating "add-on" uses of gas. Accordingly, the benefits of Class–2 research, such as gas-powered residential cooling systems, will largely accrue to current ratepayers, for "[i]t is unlikely that a consumer without existing gas service would choose gas cooling." Response of Gas Research Institute (March 23, 1989) ("GRI Response") Appendix A, Class–2 Projects. Therefore, although Class–2 technologies do create some savings for "fuel-switchers," the record demonstrates that such research would *"predominantly* benefit existing classes of gas customers." GRI Response at 4 (emphasis in original). On this basis, FERC properly rejected the Groups' contention that Class–2 research was by its nature inconsistent with the interests of current ratepayers.

The Commission then determined that Class–2 research would on balance work to the benefit of existing classes of ratepayers; in doing so, it relied on GRI's two measures of the benefits of the proposed end-use research. First, GRI calculated the *net consumer benefits* to be generated by each project by (i) adding direct consumer savings and indirect consumer savings due to reduced transmission and distribution ("T & D") costs,[6] and (ii) subtracting from that sum increased costs arising from increased gas demand. GRI Response, Appendix A at 6. Second, GRI calculated the *benefit-cost ratio* for each project, "using the following equation:

**5.** The Industrial Groups argue that FERC's order is also erroneous because "few existing ratepayers will ever buy the end-use products being developed by GRI," and thus that, although GRI research may benefit *some* existing ratepayers, it does not benefit *all* existing ratepayers. This argument, however, misunderstands our holding in *PGC I.* In that case, we ruled that FERC was required to determine whether GRI research would benefit "existing *classes* of ratepayers," *PGC I,* 866 F.2d at 476 (emphasis supplied), not each and every current ratepayer.

**6.** The Industrial Groups challenge FERC's adoption of GRI's measure of T & D savings and argue that both GRI and FERC have failed to

consider the costs of building new pipelines to carry the new demand. The record indicates, however, that FERC did consider this issue but concluded that, although there was some evidence that new construction might be necessary, that evidence was not sufficiently specific or significant to warrant adjusting the Commission's findings. 48 F.E.R.C. at 61,231–32. Moreover, GRI asserted that the current pipeline system was constructed to deliver 22.5 quads of energy and is currently delivering only 17 quads. GRI Response at 23. Because the new demand only amounts to 1.13 quads (1.1 Tcf), we find that FERC's adoption of GRI's projection of T & D savings was not unreasonable.

Consumer Savings (NPV [Net Present Value]) *divided* by the sum of the following factors: [R & D Costs *plus* Potential Demand–Induced Acquisition Cost (NPV) *minus* Transportation and Distribution Cost Savings (NPV)]."

GRI Response, Appendix A at 5. Relying on these measures, the Commission found that Class–2 research (with one exception discussed *infra*) met the net-benefits test, citing GRI's estimates of project-by-project benefit-cost ratios of between 2.6–to–1 to 11.1–to–1. 48 F.E.R.C. at 61,238–40.

Although the Commission's determination is, in general, reasoned and reasonable, we note one apparent flaw in GRI's measures.[7] Both the "net consumer benefits" and the "benefit-cost ratio" measures appear to include *both* benefits to current classes of ratepayers *and* savings to new ratepayers (fuel-switchers). GRI Response, Appendix A at 5–6. Such inclusion is inconsistent with our direction in *PGC I* that the net-benefits analysis "exclud[e] those efficiency gains that flow to consumers who switch to gas by reason of ratepayer-financed research." *PGC I,* 866 F.2d at 476. However, because the benefits that accrue to "fuel-switchers" comprise only a minority of the net consumer savings, this apparent error does not undermine the Commission's ultimate conclusion.[8]

Although the Commission's analysis of Class–2 research is generally sound, its treatment of one contested project—the "industrial refrigeration project"—merits special attention.[9] This project is noteworthy because GRI estimated that the indus-

trial refrigeration project would produce *negative* net consumers savings—in other words, the project would cost the ratepayers more than it saved them. 48 F.E.R.C. at 61,239–40. FERC, however, found that these net costs were offset by several "unquantifiable" benefits, including reduced transmission and distribution costs and environmental benefits such as reduced pollution. These countervailing benefits, however, are specious. First, transmission and distribution savings have already been included in GRI's calculation of net consumer savings. Thus, FERC's invocation of these savings to offset net consumer costs amounts to double counting. More significantly, the Commission's consideration of "common goods" such as cleaner air, is inappropriate. In *PGC I,* this court was quite clear in interpreting the NGA and FERC regulations: the relevant considerations in determining the net benefits of proposed research are benefits to ratepayers *qua* ratepayers. Although the incrementally cleaner air resulting from the proposed research might, in some marginal way, benefit ratepayers as citizens, it was not contended that ratepayers as ratepayers—*i.e.,* as consumers of natural gas—would secure special benefits from cleaner air and that that benefit somehow compensates for the fact that industrial refrigeration research will generate more economic costs than benefits for them.

Without such makeweight justifications the proposed industrial refrigeration research cannot be said to "on balance work to the benefit of existing classes of rate-

---

**7.** We also note that GRI's metric of "net consumer benefits" does not appear to take into account the costs of the research itself. However, because FERC relies most heavily on GRI's "benefit-cost ratio" (which does include the costs of the research), GRI's error is, in this case, harmless.

**8.** This analysis can be illustrated mathematically. According to the record, a majority (*i.e.,* more than half) of the consumer savings from Class–2 research will accrue to existing classes of ratepayers. *See* GRI Response, Table 2 n. 5. With the exception of the industrial refrigeration project discussed below, the benefit-cost ratios for each Class–2 project is greater than 2. Thus, even if the consumer savings used to

calculate the "benefit" variable in the benefit-cost ratio were reduced by half (to adjust for benefits accruing to fuel-switchers), the benefit-cost ratios would still be greater than 1–to–1—and, therefore, the research would pass the net-benefits test.

**9.** As we noted in *PGC I,* the Commission is not required to perform a net-benefits analysis on a project-by-project basis. *PGC I,* 866 F.2d at 477. However, in this case, FERC rightly singled out the only Class–2 project that, by GRI's estimates, was a net "loser" and offered specific reasons why, notwithstanding the projected net loss, the research should still be funded. We thus review the Commission's reasons and reasoning in reaching this conclusion.

payers" for the simple reason that the costs of that project to existing ratepayers exceed the benefits of the project for those groups. Accordingly, we find the Commission's approval of the industrial refrigeration project arbitrary and capricious and inconsistent with our directions in *PGC I.*

### c. Class–3 Research

Class–3 research consists of two projects: an effort to develop gas technologies that can be combined with existing uses of other fuels to reduce environmental pollution (the "emission-controls project" [10]) and research into the development and refinement of natural-gas-powered vehicles. The purpose of Class–3 research is to develop a captive market—to nurture "new consumer and industrial uses of gas that are highly dependent upon the gaseous form of the product ('form value'), *i.e.,* uses that do not easily accommodate a shift to alternative fuels." *PGC I,* 866 F.2d at 474; *see also* 48 F.E.R.C. at 61,240–41 n. 159. The benefits created by Class–3 research accrue almost exclusively to fuel-switchers, not to existing classes of ratepayers. Indeed, with regard to the emission-controls project, GRI estimates that only eight percent of the net consumer savings will accrue to existing classes of ratepayers; with regard to the natural-gas vehicle project, GRI does not anticipate that any meaningful savings will accrue to current ratepayers. 48 F.E.R.C. at 61,241–46. In fact, "GRI concedes that … class–3 technology … is not, by its nature, likely to benefit *existing* classes of ratepayers, because class–3 technology, by its very definition provides less than 50 percent of its consumer savings to existing ratepayer classes." 48 F.E.R.C. at 61,240 (emphasis in original).

As noted in *PGC I,* the Commission bears "a heavy burden in justifying ratepayer financing of research of this sort." *PGC I,* 866 F.2d at 477. Accordingly, the Commis-

sion "g[a]ve its closest scrutiny to" Class–3 research. 48 F.E.R.C. at 61,240. Finding that other factors outweighed the maldistribution of the benefits of Class–3 research, FERC approved both Class–3 projects. Upon review, however, we find FERC's analysis in both cases to be flawed; below we consider each project in turn.

### (i) The Emission–Controls Project

In approving the emission-controls project, the Commission relied heavily on GRI's estimate that "existing classes of ratepayers will enjoy a net benefit from this project." [11] 48 F.E.R.C. at 61,242. At first glance, GRI's conclusion in this regard appears counterintuitive—especially when one considers that only *eight percent* of the benefits of this project would accrue to existing classes of ratepayers. *See id.* However, GRI anticipates that the research will generate very large benefits ($5.66 billion per year) and therefore concludes that the benefits to current ratepayers (about $453 million, or 8 percent of $5.66 billion) will exceed the costs of the research (including the cost of increased demand, net of T & D savings). GRI Response, Appendix A, Class–3 Projects.

GRI's estimates (relied upon by FERC) of the costs of the proposed research are, however, problematic. First, GRI forecasts that this research will create very substantial new demand (almost three times the demand increase generated *by all Class–1 projects combined*). However, GRI does not calculate the cost of this increased demand, because it contends that use of the new research (and therefore the resulting new demand) is "highly price-sensitive." Accordingly, GRI discounts the anticipated new demand costs by more than eighty percent. GRI then concludes that the anticipated benefits of this project outweigh the anticipated new-demand costs (so adjusted).

---

**10.** One example of such technology is "reburn" systems, which "place gas burners above [a] boiler's primary combustion zone" and burn off certain emissions produced by that primary combustion. *See* 48 F.E.R.C. at 61,241–42.

**11.** As it did in assessing the natural-gas vehicle project, FERC also cited other "intangible" bene-

fits (such as reduced pollution) which militated in favor of approval of the emission-controls project. As discussed more fully below, however, reliance on such factors is both unreasonable and inconsistent with *PGC I.*

Such an analysis is flawed. GRI improperly compares undiscounted benefits with discounted costs. If the use of the new application is "highly price-sensitive," then *both* the anticipated costs *and* the anticipated benefits must be appropriately discounted.[12] Instead, GRI treats the benefits as a certainty, but the costs as a mere possibility. Such an analysis is erroneous and the Commission's reliance on this analysis is unreasonable.[13]

#### (ii) The Natural–Gas Vehicle Project

FERC found that, unlike the emission-controls project, the natural-gas vehicle project did not generate any quantifiable benefits for current classes of ratepayers. Nonetheless, the Commission approved that research because it found that the project will "provid[e] unquantifiable benefits such as reliable energy supplies, a healthier gas industry, enhanced competition with other energy sources ..., and

(most important as to this project) a cleaner environment." 48 F.E.R.C. at 61,248. As we have already indicated, however, such common goods do not accrue to existing ratepayers *qua* ratepayers and thus are not properly included in a net-benefits determination.[14] Accordingly, FERC's approval of the natural-gas vehicle project was unreasonable and inconsistent with this court's mandate in *PGC I*.[15]

#### CONCLUSION

In sum, we find that in its evaluation of GRI's Class–1 and Class–2 research (with the exception of the industrial refrigeration project) FERC properly and reasonably applied the standards set forth in *PGC I* and that its factual findings were supported by substantial evidence in the record as a whole. We also find that FERC's evaluation of the Class–2 industrial refrigeration project and both Class–3 projects was inconsistent with the standards set forth in

12. We recognize that, by its nature, all RD & D is somewhat speculative and the consequences of such efforts contingent. Thus, our opinion should not be read to require the Commission to discount its net-benefits analysis in light of the probability of success (or failure) of each proposed project. We merely hold that if the Commission finds the success of a project contingent, it cannot discount only the costs of the project while weighing the full value of any anticipated benefits of the research.

13. On remand, the Commission may wish to correct this error and consider anew whether the emission-controls project will "on balance benefit existing classes of ratepayers."

We also note that in *PGC I*, we declined to consider the Industrial Groups' arguments in favor of mandatory cofunding by GRI members, noting that a remand was necessary "in any event." *See PGC I*, 866 F.2d at 477 n. 9. On remand, FERC held that the court had "expressly declined to consider the cofunding issue and did not remand it to the Commission." Accordingly, FERC "consider[ed] the issue of cofunding to be beyond the scope of [its] order" on remand. 48 F.E.R.C. at 61,227 n. 59. In *PGC I*, however, we did not remand specific issues for the Commission's consideration; rather, we "vacate[d] the order under review and remand[ed] the case to FERC for further proceedings consistent with [our] opinion." FERC was therefore free to consider the issue of cofunding, and its reliance on our opinion in *PGC I* to avoid the issue was error. The Industrial Groups may properly raise the cofunding option on remand.

14. Moreover, as FERC itself has frequently noted, the Commission's statutory authority is limited—notwithstanding the broad references in its statutory mandate to "the public interest." *See NAACP v. Federal Power Commission*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (Commission lacks jurisdiction to prohibit employment discrimination by its regulatees). Although "the Commission has authority to consider ... environmental ... questions," *id.* at 670 n. 6, 96 S.Ct. at 1812 n. 6, this authority is limited "to those areas in which the agency fairly may be said to have expertise." *Bob Jones University v. United States*, 461 U.S. 574, 611, 103 S.Ct. 2017, 2038, 76 L.Ed.2d 157 (1983) (Powell, J., concurring); *see generally Public Utilities Commission of California v. FERC*, 900 F.2d 269, 280–81 (D.C.Cir.1990). There is little in the record indicating that FERC has "expertise" in determining the pollution-reducing effects of natural gas vehicles.

15. As we noted in *PGC I*, "as 'captive markets' comprise an ever greater proportion of the total consumer demand for gas, the cross-elasticities of demand between gas and alternative fuels will decline, and this will hurt ratepayers as well." *PGC I*, 866 F.2d at 475. However, because we vacate the Commission's approval of Class–3 research and because Class–3 was the only category which sought primarily to create "high form value" uses, we need not consider at this time petitioners' argument that FERC failed to account fully for the impact of GRI's end-use research on the cross-elasticity of demand between gas and other fuels.

our original opinion. We therefore grant the petition for review, vacate those portions of the Commission's order approving Class–2 industrial refrigeration research and all Class–3 research, and remand to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*